PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-2111, 17-3191, 17-3373, 17-3586, 17-3711,
17-3777, 18-1012, 18-1324, 18-2468 and 19-1037
_____

UNITED STATES OF AMERICA

v.

JABREE WILLIAMS,
a/k/a "MINUTE"

Appellant in
No. 17-2111

ROLANDO CRUZ, JR.,

Appellant in
No. 17-3191

MARC HERNANDEZ,
a/k/a Marky D.

Appellant in
No. 17-3373

ROSCOE VILLEGA,

Appellant in
No. 17-3586

EUGENE RICE,
also known as "B MOR"

Appellant in
No. 17-3711

DOUGLAS KELLY,

Appellant in
No. 17-3777

ANGEL SCHUEG, a/k/a "POCKO"

Appellant in
No. 18-1012

MAURICE ATKINSON,

Appellant in
No. 18-1324

ANTHONY SISTRUNK
a/k/a "KANYE"

Appellant in
No. 18-2468

TYREE EATMON, a/k/a Ree,

Appellant in
No. 19-1037

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D. C. Nos. 1-14-cr-00070-017:1-14-cr-0070-004;
1-14-cr-0070-001; 1-14-cr-00070-003;1-14-cr-00070-011;1-
14-cr-0070-002;1-14-cr-00070-012; 1-14-cr-00070-008; 1-
14-cr-00070-009;1-14-cr-00070-006)

District Judge:  Honorable Yvette Kane

_____

Argued December 10, 2019
Before:  RESTREPO, ROTH and FISHER, *Circuit Judges*.


(Filed: September 10, 2020)

Jonathan W. Crisp
Crisp & Associates
4031 North Front Street
Harrisburg, PA 17110
        *Counsel for Jabree Williams*

Jeremy B. Gordon
Suite 106
1848 Lone Star Road
Mansfield, TX 76063
        *Counsel for Rolando Cruz, Jr.*

Peter Goldberger  *[ARGUED]*
50 Rittenhouse Place
Ardmore, PA 19003
        *Counsel for Marc Hernandez*

Edson A. Bostic, Federal Public Defender
Tieffa N. Harper

Office of Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
        *Counsel for Roscoe Villega*

G. Scott Gardner
2117 West 4th Street
Williamsport, PA 17701
        *Counsel for Eugene Rice*

Richard F. Maffett, Jr
2201 North Second Street
Harrisburg, PA 17110
        *Counsel for Douglas Kelly*

Terrence J. McGowan
Killian & Gephart
218 Pine Street
P.O. Box 886
Harrisburg, PA 17108
        *Counsel for Angel Schueg*

John F. Yaninek  *[ARGUED]*
Thomas Thomas & Hafer
305 North Front Street, 6th Floor
Harrisburg, PA 17101
        *Counsel for Maurice Atkinson*


Daniel M. Myshin  *[ARGUED]*
P.O. Box 33
Hummelstown, PA 17036
        *Counsel for Anthony Sistrunk*

Andrew J. Shubin
333 South Allen Street
State College, PA 16801
   *Counsel for Tyree Eatmon*

David Freed, United States Attorney
Michael A. Consiglio  *[ARGUED]*
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108
   *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

In mid-September 2014, a federal grand jury in the U.S. District Court for the Middle District of Pennsylvania returned an indictment of twenty-one men from the South Side neighborhood of York, Pennsylvania. All twenty-one were charged on counts of racketeering conspiracy, drug-trafficking conspiracy, and drug trafficking. Four were also variously charged with federal firearms offenses related to the alleged trafficking. Although so called because of its geographic location in the city, South Side, the indictment alleged, had constituted since 2002 the identity of a criminal enterprise associated through its upper echelons with the Bloods, a national street gang. At the heart of the enterprise, it was said, lay an extensive drug-traf-

5

ficking operation, conducted across a defined territory and nurtured in part through sporadic episodes of occasionally deadly violence involving rival gangs, gang affiliates, and, collaterally, members of the general public.

Over the course of the ensuing year, several of the defendants pleaded guilty. Twelve, however, proceeded to a joint trial, held over eight weeks from September to November 2015. The jury heard from well over one hundred witnesses, including some of the original twenty-one who chose to cooperate with the Government in the hope of a reduced sentence. The picture that emerged was of lives characterized by cycles of crime and incarceration, stretching across more than a decade and punctuated by moments of significant and sometimes reckless violence. The witnesses depicted widespread drug dealing in crack cocaine and heroin. They told of territorial rivalries, market competition, and personal feuds. They recounted episodes of threat and retaliation, attack and retribution. But they also described friendship, loyalty, and loss; pride and fear; ambition, and great ability left unrealized. In the end, all twelve defendants were convicted on one or more of the charges against them, and in the years thereafter were sentenced to, among other things, terms of imprisonment ranging from sixty months to life.

Ten of the twelve (the Defendants) now appeal their convictions and sentences on a variety of grounds, advanced both severally and collectively. These issues, which span more or less all the relevant phases of a criminal prosecution, can be divided into five categories. First, most of the Defendants contend that because the District Court's closure of the courtroom to the public during jury selection violated their Sixth Amendment right to a public trial, their convictions should be reversed and a new trial ordered under Federal Rule of Criminal Procedure 52(b). Second, two Defendants claim that the District

6

Court's *in camera* disposition of a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), both violated their constitutional right to personal presence at all critical phases of their criminal trial and was sufficiently prejudicial to warrant reversal of their convictions. Third, several Defendants bring evidentiary challenges. Two appeal the District Court's denial of their motions to suppress evidence collected from their residences pursuant to search warrants. Still more Defendants assert various errors regarding the admission and use of evidence at trial. Fourth, nearly all the Defendants contend that the evidence was insufficient to support one or more of the verdicts against them. These challenges ask us to clarify, among other things, the effect of our recent decision in *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019)—and thereby of the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013)—upon our case law regarding the elements of a drug-trafficking conspiracy under 21 U.S.C. § 846. Finally, all the Defendants appeal their sentences, principally alleging procedural defects in the District Court's judgments.

For the reasons that follow, we will affirm the Defendants' judgments of conviction. We will also affirm the judgments of sentence of Jabree Williams and Eugene Rice. But we will vacate either in whole or in part the other Defendants' judgments of sentence, and remand the cases of Marc Hernandez and Angel Schueg for resentencing proceedings consistent with this opinion.

## I. Background

### A. Investigation and Indictment

These cases began with an act of cooperative federalism.[1] At the initiation of, and together with, local law enforcement, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted a multiyear investigation into drug trafficking and violence in the city of York, Pennsylvania. The investigation centered on what the Government called "the Southside Gang," after the neighborhood in which it was said to operate. Over the first decade of the current century, York law enforcement officials perceived in the city a pattern of escalating violence that they attributed primarily to a rivalry between the South Side and Parkway, another supposed gang, named for a public housing project in the northern part of York. The Government associated this violence, which also occasionally involved other neighborhood groups, with the widespread drug trafficking throughout the South Side. It was believed that the principal sources of these drugs—and concomitantly of the increased violence—were individuals affiliated with the Bloods, who had developed the South Side's existing drug trafficking into a more organized operation.

Legal proceedings began in mid-March 2014, when a grand jury in the Middle District of Pennsylvania returned an indictment of three men, Hernandez, Roscoe Villega, and Douglas Kelly, charging them on counts of drug-trafficking conspiracy and drug trafficking. Shortly thereafter, govern-

---

[1] We provide here a broad overview of the cases' factual and procedural background, with particular attention to the five categories of issues described above. More detailed factual description will be provided where relevant in Parts II-VI below.

ment officials obtained and executed search warrants for several locations across York, seizing (among other things) drugs, drug paraphernalia, cellphones, and money. Some of this evidence, as well as some seized later, became the subject of an ongoing contest between the parties. Hernandez, Villega, and Kelly all pleaded not guilty, but before they could proceed to trial, a superseding indictment added Rolando Cruz, Jr. to the list of defendants and supplemented the drug counts with two federal firearms charges. Cruz also pleaded not guilty, but yet again, before a trial could occur, matters developed further.

In September, the grand jury returned a second superseding indictment that vastly expanded the scope and ambition of the prosecution. The indictment now listed twenty-one defendants, including the original four. It charged all twenty-one on three counts: (I) conspiracy to violate 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d); (II) conspiracy to distribute a controlled substance, 21 U.S.C. § 846; and (III) distribution of a controlled substance, 21 U.S.C. § 841(a). Counts II and III specified drug quantities of 5 kilograms or more of powder cocaine, and 280 grams or more of crack cocaine.[2] Distribution at these quantities carries increased penalties. *See* 21 U.S.C. § 841(b)(1)(A). The indictment also included vestiges of its earlier iterations: three additional firearms charges against Cruz, Hernandez, Villega, and Kelly. Counts IV and V variously charged Hernandez and Cruz with the use of a firearm in

---

[2] The statutory term "cocaine base," 21 U.S.C. § 841(b)(1)(A)(iii), (b)(1)(B)(iii), encompasses but is not limited to crack cocaine, covering all forms of "cocaine in its chemically basic form." *DePierre v. United States*, 564 U.S. 70, 89 (2011). Because we are concerned here specifically with crack, however, we will refer simply to it.

relation to or in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c).[3] And Count VI charged Cruz, Hernandez, Villega, and Kelly[4] under 18 U.S.C. § 924(o)—conspiracy to violate § 924(c).

## B. Jury Selection

One year later, in September 2015, twelve of the twenty-one defendants proceeded to a consolidated trial before the Honorable Yvette Kane. On Friday, September 18, with jury selection set to begin the following Monday, the District Court issued a series of orders related to the upcoming *voir dire*. *See* D. Ct. Dkt. Nos. 733-40. One such order stated:

> AND NOW, on this 18th day of September, 2015, IT IS HEREBY ORDERED THAT due to courtroom capacity limitations, only (1) court personnel, (2) defendants, (3) trial counsel and support staff, and (4) prospective jurors shall be allowed in the courtroom during jury selection. No other individuals will be present except by express authorization of the Court.

App. 10.[5] Other than the concern with "courtroom capacity limitations," there is no further indication in the record of the

---

[3] The District Court later dismissed Count IV on the Government's motion at the conclusion of its case in chief.

[4] Also on the Government's motion at the end of its case in chief, the District Court dismissed Count VI as to Villega and Kelly.

[5] All references to the Appendix *simpliciter* are to three consecutively paginated appendices: Volumes I and II of the Hernandez Appendix (pages 1-295), the Government's Supplemental Appendix in Rice's case (pages 296-6902), and the Villega Appendix (pages 6903-7018).

10

District Court's rationale for conditionally barring the public from the jury-selection proceedings. There is also no evidence of an objection to the order by either the prosecution or the defense, nor is there any evidence of a news organization or other member of the public either seeking the District Court's "express authorization" or being turned away by court officials after attempting to attend the proceedings.

Jury selection lasted for two days, concluding on Tuesday, September 22. During the process, Cruz's trial counsel, Michael Wiseman, brought a *Batson* challenge to the Government's first peremptory strike of a prospective juror. The District Court heard the objection in chambers rather than in the courtroom itself, announcing its decision to do so in open court. The District Court ultimately ruled that the Government's strike was not motivated by purposeful discrimination. After the hearing, several defense counsel, led by John Yaninek, counsel for Maurice Atkinson, objected to the District Court's decision to hear the challenge out of open court. The District Court provided a detailed description of the hearing and the reasons for its ruling, and Yaninek pursued the objection no further at the time. All defense counsel thereafter professed themselves satisfied with the jury members, who were duly sworn.

The trial commenced the next day, September 23, 2015. It appears that all other proceedings were open to the public.

### C. Trial

The Government's theory was that the defendants' identification with the South Side constituted a continuing, willful participation in a criminal enterprise. The defense generally countered that, despite the illegal activity that undoubtedly occurred, expressions of a South Side identity reflected at most a kind of autochthonous pride, a loyalty borne of a common

11

home, and did not amount to the existence of a South Side gang or criminal organization.

Witnesses depicted widespread drug trafficking that was organized, or at least differentiated, according to street blocks. Each block had a group, or "crew," of individuals who would "affiliate with each other," chiefly through selling drugs, and in particular crack cocaine. App. 1523. Some crews' operations were more organized or structured, but a person from any of the crews could, without incident, sell drugs throughout the South Side. The most prominent of these groups was located at Maple and Duke Streets, near what was called the Jungle—an area formed by four streets, George, Queen, South, and Maple, with Duke running through it. The Maple and Duke crew was said to be made up largely of an older generation of South Side drug dealers. At various points, witnesses associated Rice, Schueg, Atkinson, Anthony Sistrunk, and Tyree Eatmon with Maple and Duke, while Williams was said to be part of another crew, Maple and Manor. By contrast, witnesses described Cruz, Hernandez, and Kelly as principally distributors of crack to street-level dealers. Villega was identified as an associate of Cruz and Hernandez who dealt in crack and heroin.

Together with the descriptions of drug trafficking were accounts of episodic violence. Members of the crews would carry or store away firearms for protection, and they would often retaliate when a fellow South Side member was attacked. These episodes frequently involved individuals from Parkway, who were described as rivals, but also occasionally other persons. Witnesses recalled, among other incidents, reprisals for the wanton killing of a nine-year-old girl, Ciara Savage, on Mother's Day in 2009, a violent altercation between South Side and Parkway members at a gas station and store named Rutter's, and the severe beating and eventual murder of a man

12

in the parking lot of a York restaurant called MoMo's. Such episodes, the Government charged, were overt acts in furtherance of the criminal enterprise, reflecting among other things the preservation of territory and reputation. In general, the defense sought to present these acts of violence as the product of personal feuds, rather than as indicative of a commitment to a larger operation.

### D. Verdicts and Sentencing

The jury returned its verdicts on November 16, 2015, announcing them seriatim, with only the relevant defendant present. All twelve defendants were found guilty on one or more of the counts against them. They were subsequently sentenced to various periods of incarceration and ordered to pay certain fines and costs.

The convictions and sentences of imprisonment of the ten Defendants who have appealed to our Court are as follows:

- Williams: Convicted on Count III; sentenced to 60 months of imprisonment.[6]
- Cruz: Convicted on Counts I, II, III, V, and VI; sentenced to life terms of imprisonment on Counts I-III, 5 years on Count V, and 20 years on Count VI. The terms on Counts I-III and VI are concurrent; the term on Count V is consecutive to those sentences.
- Hernandez: Convicted on Counts I, II, III, V, and VI; sentenced to life terms of imprisonment on Counts I-III, 20 years on Count VI, and 60 months on Count V. The terms on Counts I-III and VI are concurrent; the term on Count V is consecutive to the other sentences.

---

[6] Williams's conviction on Count III was for 28-280 grams of crack cocaine and some marijuana.

- Villega: Convicted on Counts I, II, and III; sentenced to 300 months in prison on each count, to be served concurrently.
- Rice: Convicted on Counts II and III; sentenced to 200 months in prison on each count, to be served concurrently.
- Kelly: Convicted on Counts I, II, and III; sentenced to life terms of imprisonment on each count, to be served concurrently.
- Schueg: Convicted on Counts II and III; sentenced to 165 months in prison on each count, to be served concurrently.
- Atkinson: Convicted on Counts I, II, and III; sentenced to life terms of imprisonment on each count, to be served concurrently.
- Sistrunk: Convicted on Counts I, II, and III; sentenced to 360 months in prison on each count, to be served concurrently.
- Eatmon: Convicted on Counts I, II, and III; sentenced to 260 months in prison on each count, to be served concurrently.

On appeal, these Defendants raise numerous issues, described above, touching their convictions and sentences.[7] We have jurisdiction to resolve these issues under 28 U.S.C. § 1291 and

---

[7] While these appeals were pending, on several occasions our Clerk's Office encouraged the Defendants to adopt, pursuant to Federal Rule of Appellate Procedure 28(i), portions of already-filed briefs rather than raise and argue duplicative issues. We appreciate that the Defendants followed those suggestions, but we have also made clear that general statements of adoption under Rule 28(i) will not be regarded. We will not serve

18 U.S.C. § 3742(a).[8]

## II. THE PUBLIC-TRIAL ERROR

We begin with the District Court's closure of the courtroom to the public during jury selection. Because a ruling for the Defendants on this issue would entail a reversal of their convictions and remand for a new trial, we confront this question at the outset. For the reasons that follow, we will not exercise our discretion to correct the error.

### A. Our Review Is for Plain Error

Review of a constitutional error of criminal procedure is at bottom a matter of rights and remedies: whether a constitutional right has been violated, and whether a remedy shall be provided for that violation. The District Court's closure of the courtroom undoubtedly violated the Defendants' Sixth Amendment right to public trial, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam), and under Supreme Court precedent that sort of violation is a "structural" error, *see Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (citing *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984)). Ordinarily contrasted with constitutional errors subject to "harmless-error analysis," *Fulminante*, 499 U.S. at 306, this category represents "a limited class of fundamental constitutional errors that," *Neder v.*

---

as a Defendant's lawyer, "scour[ing] the record" for him and determining "which of the many issues of his codefendants [are] worthy of our consideration." *United States v. Fattah*, 914 F.3d 112, 146 n.9 (3d Cir. 2019). We will resolve only those issues specifically and explicitly identified by each Defendant, noting where relevant a Rule 28(i) adoption. All else results in "abandonment and waiver." *Id.*

[8] The District Court had jurisdiction under 18 U.S.C. § 3231.

*United States*, 527 U.S. 1, 7 (1999), by their very nature, "affect substantial rights" and so cannot be "disregarded," Fed. R. Crim. P. 52(a). As a result, in determining the availability of a remedy, no further inquiry may be necessary beyond the fact of the violation itself: the injured parties are entitled to "automatic reversal." *Neder*, 527 U.S. at 7.

Yet the Federal Rules of Criminal Procedure also distinguish between preserved and unpreserved errors. A party can invoke Rule 52(a) on appeal only if he timely objected to the error, thus giving the district court the opportunity to rectify, or at least respond to, the purported problem. *See* Fed. R. Crim. P. 51(b) (describing the procedure for contemporaneous objection). If the Defendants had done so here, and the District Court responded inadequately, then they would indeed be entitled to a new trial. But they did not object; and regardless of the nature of the error, in direct appeals from judgments of conviction in the federal system, when there is no contemporaneous objection in the district court, our review must be for plain error under Federal Rule of Criminal Procedure 52(b). *Johnson v. United States*, 520 U.S. 461, 466 (1997).

A federal appellate court's authority to remedy an unpreserved error "is strictly circumscribed." *Puckett v. United States*, 556 U.S. 129, 134 (2009). Following the text of Rule 52(b), the Supreme Court has described a four-part inquiry for plain-error review. There must: (1) be an "error" that (2) is "plain" and (3) "affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (alteration omitted) (quoting Fed. R. Crim. P. 52(b)). If these three conditions are satisfied, then it is "within the sound discretion of the court of appeals" to correct the forfeited error—but only if (4) "the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (alteration omitted) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). "Meeting all four

prongs is difficult, as it should be." *Puckett*, 556 U.S. at 135 (internal quotation marks omitted). In this appeal, the Government concedes that the District Court committed an error, and that the error is plain. The dispute concerns *Olano*'s third and fourth prongs.

## B. *Olano* Prong Three

"[I]n most cases," for an unpreserved error to affect substantial rights it "must have been prejudicial"—that is, "[i]t must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. The defendant ordinarily has the burden of showing "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (alteration omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). However, the Court in *Olano* also acknowledged that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome." 507 U.S. at 735. Hernandez urges us not only to associate this "special category" with structural error, but also to give the error here the same effect it would have in the Rule 52(a) context—automatic reversal of the convictions. We cannot accept this argument.

The Supreme Court has never held that *Olano*'s "special category" includes or is the same as that of structural error. It therefore remains at least unclear whether a structural error ipso facto satisfies *Olano*'s third prong. The Court has consistently acknowledged but declined to address this possibility. *See United States v. Marcus*, 560 U.S. 258, 263 (2010); *Puckett*, 556 U.S. at 140-41; *United States v. Cotton*, 535 U.S. 625, 632-33 (2002); *Johnson*, 520 U.S. at 469; *see also Dominguez Benitez*, 542 U.S. at 82 (suggesting that *Olano*'s third prong should be treated as "[]tethered to a prejudice requirement" in

17

cases of "nonstructural error"). We too find it unnecessary to take that doctrinal leap here. Because, as detailed below, a federal appellate court's evaluation of *Olano*'s fourth prong is independent of whether the third has been satisfied, and the District Court's error in this case did not "seriously affect the fairness, integrity or public reputation of judicial proceedings," *Olano*, 507 U.S. at 736, we do not need to decide whether the error also affected the Defendants' substantial rights.[9]

## C. *Olano* Prong Four

### 1. Structural Error Generally

The fact that a type of error has been deemed "structural" has no independent significance for applying *Olano*'s fourth prong. In all direct appeals arising in the federal system, "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." *Johnson*, 520 U.S. at 466. Rule 52(b) states that a court "may" consider "[a] plain error that affects substantial rights." If *Olano*'s first three prongs are satisfied, the court of appeals has the "authority" to notice the error, "but is not required to do so." *Olano*, 507 U.S. at 735. "[A] plain error affecting substantial rights does not, without more, satisfy" *Olano*'s fourth prong. *Id.* at 737. Thus, even if we accepted that

---

[9] Our dissenting colleague would presume prejudice given the nature of the error at issue here. *See* Dissenting Op. at III.A. We emphasize that in declining to conduct an inquiry at prong three, we intend no suggestion that the present error, or any structural error, does not warrant a presumption of prejudice. Our conclusion at prong four simply renders a decision on that question unnecessary, and we will not go out of our way to make new law. The dissent, by contrast, must address prong three because of its contrary conclusion at prong four.

a structural error necessarily affects substantial rights, our decision would still be an exercise of discretion, calling for an independent inquiry on the fourth prong.[10]

Nevertheless, although a structural error is not to be given automatic effect in the Rule 52(b) context, the same considerations that in other contexts render its correction automatic may coincide with the appropriate exercise of judicial discretion to notice an unpreserved error. A structural defect is an error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310. When such an error occurs over a contemporaneous objection, the trial "cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). The origins of Rule 52(b) lie in the recognition that "if a plain error was committed in a matter so absolutely vital to defendants," the reviewing court is "at liberty to correct it." *Wiborg v. United States*, 163 U.S. 632, 658 (1896). When the error threatens "the fair and impartial conduct of the trial," the fact that it was not raised contemporaneously "does not preclude [the appellate court] from correcting [it]." *Brasfield v. United States*, 272 U.S. 448, 450 (1926). As the Supreme Court said in its most recent case on this issue, "the public legitimacy of our justice system relies on procedures that are neutral, accu-

---

[10] It is true, as Hernandez points out, that our Court has in the past "assume[d]" in dictum that a structural error "would constitute per se reversible error even under plain error review." *United States v. Syme*, 276 F.3d 131, 155 n.10 (3d Cir. 2002). Yet we are not bound by that statement, and it is in any event contrary to the Supreme Court guidance just detailed.

rate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (internal quotation marks omitted).

Therefore, even when confronting a structural error, a federal court of appeals should evaluate the error in the context of the unique circumstances of the proceeding as a whole to determine whether the error warrants remedial action. *See id.* at 1909 ("[A]ny exercise of discretion at the fourth prong of *Olano* inherently requires 'a case-specific and fact-intensive' inquiry." (quoting *Puckett*, 556 U.S. at 142)). The very nature of the error may warrant a remedy in the ordinary case, *id.* at 1909 n.4, and actual innocence is dispositive, *Olano*, 507 U.S. at 736, but these are not the same as automatic reversal. In all direct appeals from a criminal conviction in the federal system, the discretion contemplated by Rule 52(b) is to be preserved.

## 2. Public-Trial Error Specifically

This conclusion receives additional support from our own and the Supreme Court's case law on violations of the Sixth Amendment right to a public trial.

The presence of a contemporaneous objection is an important reason why violations of that right were deemed structural error. As early as 1949—in a case, like the present ones, from the Middle District of Pennsylvania—our Court reversed a criminal conviction and remanded for a new trial due to a Sixth Amendment public-trial violation. *United States v. Kobli*, 172 F.2d 919, 924 (3d Cir. 1949) (en banc). In doing so, we held "that the Sixth Amendment precludes the general indiscriminate exclusion of the public from the trial of a criminal case in a federal court *over the objection of the defendant*." *Id.* at 923 (emphasis added). Further, in a later case we maintained that "a defendant who invokes the constitutional guarantee of

a public trial need not prove actual prejudice" on appeal. *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 608 (3d Cir. 1969) (en banc).

The Supreme Court has expressed similar sentiments. Like *Rundle*, *Waller* concerned a Sixth Amendment challenge to a state trial court's closure of a suppression hearing. Under its First Amendment precedent, the Court noted, "the right to an open trial" is generally, but not absolutely, paramount. *Waller*, 467 U.S. at 45 (citing, e.g., *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)). To justify a closure, there must be "an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48. *Waller* extended this framework to the Sixth Amendment, holding "that under the Sixth Amendment any closure of a suppression hearing *over the objections of the accused* must meet the tests set out in Press-Enterprise and its predecessors." *Id.* at 47 (emphasis added). The Court later applied this standard to a state court's closure of jury selection to the public. *Presley*, 558 U.S. at 213. As in *Waller*, defense counsel had objected contemporaneously. *Id.* at 210. Under these cases, then, a violation of the right to a public trial is a reversible error when a party lodges a contemporaneous objection and the trial court fails to articulate the interest behind the closure or to make the appropriate findings.

The Supreme Court's first consideration of a Sixth Amendment public-trial violation in the absence of a contemporaneous objection came in *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017). Yet that case arose not under Rule 52(b), but rather in a state collateral proceeding, on a claim of ineffective assistance of counsel. The Court held that, in this context, the proper standard to apply is the familiar one under *Strickland v.*

21

*Washington*, 466 U.S. 668 (1984). *See* 137 S. Ct. at 1910-12. While the Sixth Amendment public-trial right "is important for fundamental reasons," the Court explained, "in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." *Id.* at 1910. This reality underlines the importance of a contemporaneous objection, which gives the trial court "the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure." *Id.* at 1912. The Court also noted that "when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent." *Id.* By contrast, an ineffective-assistance-of-counsel claim first raised in postconviction proceedings "'can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial,' thus undermining the finality of jury verdicts." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). The Court concluded that Weaver had not carried his burden to show either that he had been prejudiced or that the trial was rendered fundamentally unfair. *Id.* at 1913.

Our principal question must be whether and how *Weaver*'s analysis in the collateral-review context informs plain-error review of public-trial violations. The conclusion that not every public-trial violation results in fundamental unfairness supports the particularized inquiry described above. And while the concern with the finality of judgments might ostensibly distinguish *Weaver*'s context from the present one, it is nevertheless true that reversal for an error raised for the first time on direct review carries its own "systemic costs." The unique considerations raised by appeal on an unpreserved error should not be disregarded simply because of the nature of the error. They may be overcome, but not disregarded. *See Puckett*,

22

556 U.S. at 135 ("We have repeatedly cautioned that any un-warranted extension of the authority granted by Rule 52(b) would disturb the careful balance it strikes between judicial efficiency and the redress of injustice." (alteration and internal quotation marks omitted)); *United States v. Atkinson*, 297 U.S. 157, 159 (1936) (observing that the practice of not correcting unpreserved errors is in part "founded upon considerations . . . of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact").

In sum, both our own and the Supreme Court's jurisprudence on the Sixth Amendment right to a public trial support the application here of the "case-specific and fact-intensive inquiry" that a federal appellate court is normally to conduct under *Olano*'s fourth prong. *Rosales-Mireles*, 138 S. Ct. at 1909 (internal quotation marks omitted).

### 3. The Legal Standard

Given the relative novelty of a public-trial error reviewed under Rule 52(b), our inquiry must look to general principles discernible in our own and the Supreme Court's case law on *Olano*'s fourth prong and its antecedents. Because "each case necessarily turns on its own facts," an appellate court's exercise of discretion is properly based on its evaluation of which result would most "promote the ends of justice." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240 (1940). In conducting this evaluation, the Court has frequently weighed the costs to the fairness, integrity, and public reputation of judicial proceedings that would result from allowing the error to stand with those that would alternatively result from providing a remedy. We will adopt this standard here.

*First*, in determining the costs of inaction, the Supreme Court has focused chiefly upon the error's effect on the values

23

or interests protected by the violated right. For example, at stake in *Rosales-Mireles*—which involved a Sentencing Guidelines calculation error—was the defendant's liberty, and an error "reasonably likely to have resulted in a longer prison sentence than necessary" sufficiently compromised that interest to advise correction. 138 S. Ct. at 1910. A reasonable citizen, the Court noted, would "bear a rightly diminished view of the judicial process and its integrity" if the error were allowed to stand. *Id.* at 1908 (quoting *United States v. Sabillon-Umana*, 772 F.3d 1328, 1333-34 (10th Cir. 2014)); *see also United States v. Dahl*, 833 F.3d 345, 359 (3d Cir. 2016).

Similarly, in other contexts, the Court has looked to the error's effect on the jury's verdict. In *Cotton* and *Johnson*, the interests underlying the right at issue[11] were not so compromised that correction was warranted—in each case, notwithstanding the error, the evidence supporting conviction was "overwhelming" and "essentially uncontroverted." *Cotton*, 535 U.S. at 633; *Johnson*, 520 U.S. at 470; *see also United States v. Vazquez*, 271 F.3d 93, 105-06 (3d Cir. 2001) (en banc). Likewise, in *Young*, the harmful effects of a prosecutor's inappropriate statements—a violation of his "duty to refrain from overzealous conduct," 470 U.S. at 7—were sufficiently "mitigated," both by improper statements of defense counsel and by "overwhelming evidence," *id.* at 16-19.

Evaluation of the degree to which an error has compromised the violated right's underlying values or interests does not, however, necessarily reduce to a determination of whether

---

[11] A criminal defendant is entitled to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)).

the error likely altered the outcome of the proceeding. Though a "court of appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant," the Supreme Court has "never held that a Rule 52(b) remedy is *only* warranted in cases of actual innocence." *Olano*, 507 U.S. at 736 (emphasis in original); *see also Rosales-Mireles*, 138 S. Ct. at 1906. In cases predating *Cotton*, *Johnson*, and *Young*, for example, the Court held that the error at issue sufficiently compromised the fairness and impartiality of the trial that correction was justified. *See Brasfield*, 272 U.S. at 450; *Clyatt v. United States*, 197 U.S. 207, 222 (1905). At the same time, apart from cases of actual innocence, an altered outcome does not in itself necessitate correction of the error. In *Rosales-Mireles*, the Court allowed that "countervailing factors [could] satisfy the court of appeals that the fairness, integrity, and public reputation of the proceedings will be preserved absent correction," though it did not elaborate on what such factors might be, concluding only that none existed in the case before it. 138 S. Ct. at 1909.

*Second*, against these considerations of the costs of inaction, the Court has weighed the costs to the fairness, integrity, and public reputation of judicial proceedings that would alternatively result from noticing the error. In *Rosales-Mireles*, the Court noted "the relative ease of correcting the error," *id.* at 1908, commenting that "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does," *id.* (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1348-49 (2016)); *see also United States v. Williams*, 399 F.3d 450, 456 (2d Cir. 2005) ("A legal system seeks to protect rights, but it also takes into account the costs in time, resources, and disruption in the lives of participants . . . that result when a case must be tried a second time."). And in *Cotton* and *Johnson*, the Court perceived "[t]he real threat . . .

25

to the fairness, integrity, and public reputation of judicial pro-ceedings" to be if the error were corrected "despite the over-whelming and uncontroverted evidence that" the outcome of the proceeding would have been the same regardless. *Cotton*, 535 U.S. at 634 (internal quotation marks omitted); *see also Johnson*, 520 U.S. at 470.

### 4. Application and Resolution

Applying this standard, we conclude that the District Court's error does not warrant reversal of the Defendants' con-victions and remand for a new trial.[12]

*First*, the costs of inaction, while not negligible, do not rise to the level recognized in other cases where a remedy has been provided. The Sixth Amendment's public-trial guarantee is "for the benefit of the accused." *Waller*, 467 U.S. at 46 (quot-ing *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). It is a means of ensuring the fairness of the trial—"that the pres-ence of interested spectators may keep [the defendant's] triers keenly alive to a sense of their responsibility and to the im-portance of their functions." *Id.*; *see also United States v. Lnu*, 575 F.3d 298, 305 (3d Cir. 2009) ("The knowledge that every criminal trial is subject to contemporaneous review in the fo-rum of public opinion is an effective restraint on possible abuse

---

[12] We acknowledge that one of our sister circuits has reached a different conclusion. *See United States v. Negrón-Sostre*, 790 F.3d 295, 306 (1st Cir. 2015). However, that case was decided prior to *Weaver* and *Rosales-Mireles*, and it relied in part upon circuit precedent that *Weaver* subsequently abrogated. *See id.* (stating that *Owens v. United States*, 483 F.3d 48 (1st Cir. 2007), "guides our analysis"); *see also Lassend v. United States*, 898 F.3d 115, 122 (1st Cir. 2018) (acknowledging *Weaver*'s abrogation of *Owens*).

of judicial power." (quoting *Gannett*, 443 U.S. at 380)). More broadly, public access to trial proceedings helps sustain public confidence that standards of fairness are being observed. *See Press-Enterprise*, 464 U.S. at 509.

The District Court's September 18 order stated that, "due to courtroom capacity limitations," only court personnel, defendants, trial counsel and support staff, and prospective jurors would be allowed in the courtroom during jury selection. App. 10. All other individuals could be present only "by express authorization of the Court." *Id.* As noted above, the record gives no further indication of the District Court's rationale for issuing the order. There is no evidence that any party or member of the press or public objected to the order, nor is there any evidence of an individual or news organization either seeking authorization from the District Court or being turned away after attempting to attend the proceedings. Jury selection ultimately lasted only two days, September 21 and 22, with the trial beginning on September 23. All other proceedings were open to the public, and a transcript of the jury *voir dire* was later made available.

Even on this sparse record, there are facts that suggest some costs should the error remain uncorrected. The closure order came from the District Court itself and extended across an entire phase of the trial. The Court apparently issued the order unprompted, and there is no indication that it—albeit without objection to the order by the parties, counsel, or the public—considered reasonable alternatives. It is undeniable that the order to some degree compromised the values underlying the public-trial right. It had the potential to call into question the fairness, integrity, and public reputation of judicial proceedings because it stamped the violation of the Defendants'

Sixth Amendment right with the imprimatur of the federal judiciary itself, thereby undermining public confidence in its impartiality.

Nevertheless, there are several countervailing factors that sufficiently mitigate this possibility. For one, although the closure encompassed all of the jury-selection phase, those proceedings lasted only two days; the public had access to all other phases of the trial, which in total lasted longer than seven weeks. *See, e.g.*, *Weaver*, 137 S. Ct. at 1913 ("The closure was limited to the jury *voir dire*; the courtroom remained open during the evidentiary phase of the trial."); *Press-Enterprise*, 464 U.S. at 510 (finding it significant that "[a]lthough three days of *voir dire* in this case were open to the public, *six weeks* of the proceedings were closed" (emphasis in original)). Further, a transcript of the proceedings was produced and later disclosed. *See* D. Ct. Dkt. Nos. 974-993, 997-1005, 1024-1027; *see also Weaver*, 137 S. Ct. at 1913; *Press-Enterprise*, 464 U.S. at 513. And as our Court has said, "[i]t is access to the content of the proceeding—whether in person, or via some form of documentation—that matters." *United States v. Antar*, 38 F.3d 1348, 1359-60 (3d Cir. 1994) (emphasis omitted).[13] Moreover, knowledge both of the media's attention to the trial and of the transcript's production (which ensures publicity in perpetuity) may have had a similar effect on the proceedings' participants as real-time public access would have had, keeping them

---

[13] This is not to suggest, as *Antar* makes clear, that subsequent release of the transcript may substitute for closure. *See* 38 F.3d at 1360 n.13. Our point here is that, for purposes of plain-error review, subsequent disclosure of the transcript, while not a perfect substitute, at least mitigates the harm caused by the closure.

28

"keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46 (quoting *Gannett*, 443 U.S. at 380). In addition, although the general public was not, absent authorization, able to be present at jury selection, as in *Weaver*, "there were many members of the venire who did not become jurors but who did observe the proceedings." 137 S. Ct. at 1913. Finally, there has been "no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands." *Id.*

The ways, then, in which the closure potentially compromised the values protected by the Defendants' Sixth Amendment right are answered by countervailing factors suggesting that those values were in other respects substantially vindicated—that, in spite of the closure, the jury-selection proceedings possessed the publicity, neutrality, and professionalism that are essential components of upholding an accused's right to a fair and public trial. Allowing the error to stand would not leave in place an unmitigated nullification of the values and interests underlying the right at issue.

*Second*, the costs of remedial action here would be significant. Unlike in *Rosales-Mireles*, we are confronted with a remand for a new trial in ten consolidated cases whose original trial occurred almost five years ago, spanned approximately two months, and involved well over one hundred witnesses. But even in the absence of the heavy burdens specific to these cases, the prospect of retrial demands "a high degree of caution," *Rosales-Mireles*, 138 S. Ct. at 1909, and implicates more fully the Supreme Court's admonition that we exercise our discretion under Rule 52(b) "sparingly," *id.* (quoting *Jones v. United States*, 527 U.S. 373, 389 (1999)). Moreover, when the

Supreme Court in *Waller* acknowledged a public-trial error under the Sixth Amendment, it did not automatically reverse the convictions and remand for a new trial. Even there, on review of a preserved error, it cautioned that "the remedy should be appropriate to the violation" and contemplated the possibility that in some instances "a new trial . . . would be a windfall for the defendant, and not in the public interest." 467 U.S. at 50. The same general consideration applies here: the remedy is to be assessed relative to the costs of the error.

***

The practical costs of correcting the District Court's error are not dispositive,[14] but when we consider them along with the mitigated costs of inaction, we decline to exercise our discretion in this instance. The importance of the "searchlight" of the public trial is "deeply rooted" in the history of our federal constitutional order and system of justice; and it has long been a feature of our Court's jurisprudence. *Rundle*, 419 F.2d at 605-06. Nevertheless, on this record, we cannot say that the values underlying the Defendants' right to a public trial were sufficiently compromised that the costs to the fairness, integrity, and public reputation of judicial proceedings that would result

---

[14] There was some dispute at oral argument over the analytical significance of sandbagging, despite no suggestion that it occurred here. *See* Oral Arg. at 2:53:28-2:55:54; 3:01:24-3:02:30. Although sandbagging can be a concern, *see United States v. Bansal*, 663 F.3d 634, 661 (3d Cir. 2011), we decline here to give it weight. For one, it is already accounted for doctrinally through the *Olano* test. *See Puckett*, 556 U.S. at 134. And the specter of sandbagging is most acute where the precedent established would be an automatic new trial. Under our standard, there is no such automaticity, each case turning on its own facts.

from letting the District Court's error stand outweigh those that would alternatively result from reversing the Defendants' convictions and remanding for a new trial. We cannot, in sum, say that the District Court's closure of jury selection to the public "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736.[15]

### III.   RIGHT-TO-PRESENCE CHALLENGE

Atkinson argues that the District Court's *in camera* resolution of the *Batson* challenge during jury selection violated his constitutional "right to personal presence at all critical stages of the trial." *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). He further contends that the exclusion was sufficiently prejudicial to warrant a new trial. The Supreme Court has made

---

[15] Our dissenting colleague places great weight on the distinction between harmless and structural error. He suggests that in considering the costs of letting the error stand, we improperly "rel[y] on cases that consider errors reviewed for harmlessness." Dissenting Op. at III.B. And rather than accounting for the costs of correction, he thinks "[t]he nature of the error . . . must be the lodestar of our" analysis. *Id.* But "the term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Weaver*, 137 S. Ct. at 1910. The present cases ask us to weigh the intersection of two fundamental distinctions in criminal procedure: harmless and structural error, and preserved and unpreserved error. The dissent would give dispositive weight to the former. In our view, at least in the context of public-trial errors, neither the case law nor the competing values at stake warrant that approach. And to the extent the dissent simply weighs the costs of inaction differently here, we acknowledge his concerns, but respectfully reach the opposite conclusion on the facts before us.

clear that violations of the right to be present are subject to harmless-error review. *See Fulminante*, 499 U.S. at 306-07 (citing *Rushen*, 464 U.S. at 117-18 & n.2). We may assume without deciding that there was a violation here, because even if an error occurred, "it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).[16]

In evaluating a putative equal protection violation under *Batson*, trial courts are to follow a three-step process.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (citing *Batson*, 476 U.S. at 96-98). "[T]he job of enforcing *Batson* rests first and foremost with trial judges," who may consider a number of factors in determining whether racial discrimination has occurred. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). These include: whether the prosecutor's proffered explanations are pretextual, *see Snyder v. Louisiana*, 552 U.S. 472, 485 (2008), which can be shown through "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve," *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); "a prosecutor's misrepresentations of the record when defending the strike[]," *Flowers*, 139 S. Ct. at 2243; and any other "circumstantial evidence that 'bears upon the issue of racial animosity,'" *Foster v. Chatman*, 136 S. Ct. 1737, 1754

---

[16] Kelly adopts Atkinson's argument under Rule 28(i).

(2016) (alteration omitted) (quoting *Snyder*, 552 U.S. at 478)). *Batson*'s third step "turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to [trial] court factual findings unless we conclude that they are clearly erroneous." *Id.* at 1747 (quoting *Snyder*, 552 U.S. at 477)).

Here, there is no reasonable basis for concluding that prejudice resulted from the District Court's conduct of the *Batson* hearing. At no point during the hearing or afterward did the District Court or defense counsel suggest that any of the Government's proffered reasons were pretextual, that the Government had misrepresented the record, or that any other circumstantial evidence suggested racial bias. Indeed, Wiseman—who had raised the objection and was one of two defense counsel present—acknowledged at the hearing, and Atkinson concedes on appeal, that the Government "stated race-neutral reasons." App. 667. And when Wiseman and Royce Morris, the other defense attorney present, questioned whether the characteristics that led the Government to strike the juror were unique among the persons in the venire, the District Court proceeded, with Wiseman and Morris's assistance, to search the questionnaires for any other remaining juror with characteristics similar those for which the juror was struck—in particular, the existence of multiple relatives who had been criminally convicted and imprisoned, including for drug trafficking. The search revealed no comparable jurors still on the panel. The record before us provides no basis for doubting the District Court's side-by-side comparison of the jurors. *See Davis v. Ayala*, 576 U.S. 257, 274 (2015).[17] Finally, we have not been shown any evi-

---

[17] *Ayala* was decided under the stricter standard applied on habeas review of a state court decision. *See* 576 U.S. at 267-68. However, the Court gives no indication that its decision on this

dence that might otherwise contradict the Government's representations or suggest that it acted on grounds of racial animus.

In sum, we have no reason to conclude that Atkinson's absence from the *Batson* hearing was prejudicial. If, therefore, "the alleged constitutional error" occurred, it was "harmless beyond a reasonable doubt." *Rushen*, 464 U.S. at 121.

## IV. EVIDENTIARY CHALLENGES

The Defendants' evidentiary challenges fall into three basic categories. First, Kelly and Sistrunk appeal the District Court's denial of their motions to suppress evidence obtained from searches of their residences. Second, Atkinson asserts that the Government knowingly persisted in the use of perjured testimony, thus violating his constitutional right to due process. Finally, those Defendants and four others challenge some of the District Court's decisions regarding the admission of evidence. We find no error in any instance.

## A. Suppression

Shortly after the grand jury returned its initial indictment in March 2014, federal agents searched Kelly's apartment at 337 East Philadelphia Street in York, seizing evidence later introduced at trial. Almost exactly six months later, just after the return of the second superseding indictment, agents conducted a similar search of Sistrunk's apartment, located at 326 West Philadelphia Street, also seizing evidence that was later introduced. The Government conducted each search pursuant to a warrant issued by Magistrate Judge Carlson. ATF Special Agent Scott Endy signed the warrant applications and attached a sworn affidavit to each of them, detailing his decades-long experience in federal law enforcement, the history of the South

---

point would have been different under the "clear error" standard we are to apply here. *See Foster,* 136 S. Ct. at 1747.

34

Side investigation, and the basis for probable cause. To establish the latter, he relied in part upon information provided by several confidential informants relating to Kelly and Sistrunk's drug-trafficking activities.

Approximately two months before the trial, Kelly and Sistrunk filed motions to suppress the evidence obtained from the searches. They contended that the information in the affidavits was insufficient to establish a factual basis for probable cause and that the exclusionary rule's good-faith exception did not apply. The District Court held hearings on the motions on August 28, 2015 and denied both of them less than a week later. It included with each of its orders a memorandum explaining its decision. Kelly and Sistrunk now appeal those orders, raising largely the same arguments they did before the District Court.

## 1. Kelly

"[N]o Warrants shall issue," the Fourth Amendment declares, "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This clause was intended "to affirm and preserve a cherished rule of the common law, designed to prevent the issue of groundless warrants." *McGrain v. Daugherty*, 273 U.S. 135, 156 (1927). We are satisfied that the warrant to search Kelly's residence was not groundless: Special Agent Endy's affidavit supplied a sufficient basis for probable cause.

### *The Legal Standard*

"Our review of the denial of a motion to suppress is for clear error as to the District Court's findings of fact, and plenary as to legal conclusions in light of those facts." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018). In contexts like the present, though, that latter standard applies only to our

35

review of "the District Court's evaluation of the magistrate's probable cause determination." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010). We pay great deference to the magistrate's initial determination, asking only "whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). It is distinctly the magistrate's task to make the "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238 (internal quotation marks omitted).

Specifically, "[w]hen the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there." *Stearn*, 597 F.3d at 558. We have long maintained that when a suspect is involved in drug trafficking, on a significant scale or for an extended period of time, it is reasonable to infer that he would store evidence of that illicit activity in his home. *See United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001); *United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000). It is insufficient, however, if the affidavit suggests only that the suspect "is actually a drug dealer" and "that the place to be searched is possessed by, or the domicile of, the [suspect]." *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002). There must also be evidence "*linking* [the targeted location] to the [suspect]'s drug activities." *Id.* (emphasis added). "[T]he search of a drug dealer's home would be unreasonable if the affidavit suggested no reason to believe contraband would be found there." *Stearn*, 597 F.3d at 559.

36

Further, when (as here) the affidavit refers to information gained from confidential informants, bare conclusory assertions by the affiant of the reliability and veracity of the informants are insufficient. *See Gates*, 462 U.S. at 239. "Mere affirmance of belief or suspicion is not enough." *Nathanson v. United States*, 290 U.S. 41, 47 (1933). But when "independent police work" substantially corroborates the information of a confidential informant, "an entirely different case" is presented. *Gates*, 462 U.S. at 241-42. "[C]orroborat[ion] in significant part by independent police investigation" may provide the requisite substantial basis for a magistrate's finding of probable cause, to which we will defer. *Stearn*, 597 F.3d at 556, 557-58; *see also Gates*, 462 U.S. at 246.

### *Application and Resolution*

Informants told law enforcement of several interactions with Kelly related to drug trafficking. In September 2013, an informant identified Kelly in a photograph and stated that he had supplied the informant with crack "on numerous occasions in the recent past." Kelly App. 120, ¶ 18. Another informant described a February 2014 encounter in which the informant asked Kelly for crack to distribute, and Kelly responded that he was going to Atlantic City to get some more cocaine. Around that same time, a third informant told a York police detective that Hernandez was supplying Kelly with large amounts of crack. These data points suggest that Kelly was at least involved in the sale and supply of crack cocaine shortly before the warrant issued.

That suggestion was corroborated by independent police work. The affidavit describes two incidents that occurred in September 2013. York law enforcement conducted a controlled delivery of $120 to Kelly through a confidential source who had been fronted cocaine. Six days later, law enforcement

oversaw a controlled buy and delivery of crack involving Kelly. The source received the drugs earlier in the day, and later delivered $150 to Kelly "at 337 E. Philadelphia Street." Kelly App. 129, ¶ 57. There was some dispute over this wording at the suppression hearing, and Kelly contends on appeal that it incorrectly implies that the transaction took place inside his residence, when the police report states that the transaction occurred in front of the building. For the reasons given above, however, that distinction is not decisive. The incident at least indicates that in the months prior to the warrant application, Kelly was conducting drug transactions in close physical proximity to his apartment.

The final relevant incident in the affidavit is the most significant. In early March 2014, about two weeks before Kelly was indicted, federal and local law enforcement (including Special Agent Endy) conducted a controlled purchase of crack from Kelly through a cooperating source. Surveillance documented Kelly leaving his East Philadelphia Street apartment, driving to the location, delivering (what was later confirmed to be) crack to the source, and then returning immediately to his apartment. "While we generally accept the common sense proposition that drug dealers often keep evidence of their transactions at home, that inference is much stronger when the home is the first place a drug dealer proceeds following such a transaction." *Burton*, 288 F.3d at 104 (citation omitted).

In sum, independent police work corroborated the suggestion of multiple informants that Kelly was not an occasional street-level dealer, but one who consistently sold and supplied crack to others in the months and weeks leading up to the warrant application. Further, that police work provided evidence placing Kelly's residence on East Philadelphia Street in close spatial and temporal proximity to his illegal activity. Magistrate Judge Carlson therefore had ample basis to conclude there

was "a fair probability that contraband or evidence of a crime w[ould] be found" at the apartment. *Gates*, 462 U.S. at 238.

## 2. Sistrunk

Our Court has "turn[ed] directly to the good faith issue" when we concluded that a defendant's probable-cause arguments did not "involve novel questions of law whose resolution is necessary to guide future action by law enforcement officers and magistrates." *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 145 (3d Cir. 2002) (alterations and internal quotation marks omitted); *see United States v. Leon*, 468 U.S. 897, 925 (1984). We think such a move is appropriate here, and we will affirm the denial of Sistrunk's motion on good-faith grounds.

### *The Legal Standard*

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). One triggering circumstance is when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). The *Franks* rule, we have said, encompasses not only an affiant's assertions, but also his omissions. *See Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). Our standard for assertions "is that . . . 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (quoting *Wilson*, 212 F.3d at 788). For omissions, by contrast, we ask whether the

"officer withholds a fact in his ken that any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Wilson*, 212 F.3d at 788 (alteration and internal quotation marks omitted).

Although *Wilson* concerned an action under 42 U.S.C. § 1983, we have also applied it to resolve appeals of judgments following *Franks* hearings. *See Brown*, 631 F.3d at 648-49; *United States v. Yusuf*, 461 F.3d 374, 383-84 (3d Cir. 2006). We will extend this approach to cases where, as here, *Franks* is raised in the good-faith context—where the question is only whether the exclusionary rule should apply. Yet our concern is with only the first prong of the *Franks* test—that the affiant acted deliberately to conceal the truth or with "reckless disregard for the truth." *Franks*, 438 U.S. at 171; *see Leon*, 468 U.S. at 923. The inquiry at the second prong—that the "false statements or omissions . . . [be] material, or necessary, to the finding of probable cause," *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)—is unnecessary because the presumption is that a Fourth Amendment violation has occurred. *See Herring*, 555 U.S. at 145; *Leon*, 468 U.S. at 922 n.23.

This accordingly demands adjusting the application of the first prong when an affiant's alleged omissions are at issue. In the § 1983 context, we have applied the first prong in light of the second, asking at the former whether the omitted facts and circumstances were "relevant to the existence of probable cause." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 471 & n.9 (3d Cir. 2016). But, when good faith is concerned, the proper question is not simply whether the allegedly omitted information was known to the affiant and relevant to the magistrate's probable-cause inquiry, but also whether the deliberate or reckless omission, if it occurred, was "so objectively culpable as to require exclusion." *Herring*, 555 U.S. at 146; *see also*

40

*Dempsey*, 834 F.3d at 473 n.13 (noting that satisfaction of its standard does not necessarily amount to a finding of bad faith).

### *Application and Resolution*

Sistrunk identifies four instances where Special Agent Endy allegedly omitted relevant facts, thereby "misle[ading] the magistrate judge in reckless disregard for the truth." Sistrunk Br. at 26.

First, the affidavit states that on July 8, 2007, "a Southside gang member" was "fatally shot multiple times." Sistrunk App. 170. A suspect later made "a statement to police [that] implicated Anthony Sistrunk as being . . . with him during the shooting." *Id.* Sistrunk contends that this statement "fail[ed] to inform the . . . magistrate that [the suspect] exonerated [him] of any role in th[e] shooting." Sistrunk Br. at 25.

Second, the affidavit relates that in April 2009, Sistrunk fled a vehicle stop and was later arrested. Police discovered two firearms in the vehicle. Sistrunk was later "convicted of fleeing or attempting to elude police." Sistrunk App. 170. He now contends that this account omits the fact that some firearms-related charges were withdrawn, and that the jury acquitted him of other offenses.

Third, according to the affidavit, while Sistrunk was in prison in September 2009, an ATF Special Agent "obtained the inmate visitor list for Sistrunk which indicated an association with multiple Southside Gang members." Sistrunk App. 170. Sistrunk argues that this information "failed to report that none of [his] co-defendants listed on his prison visitor list actually visited [him]." Sistrunk Br. at 26.

The fourth instance concerns the homicide of Christen Latham in November 2012. The affidavit states that "police identified . . . Sistrunk as being involved in an altercation with

41

the victim prior to his murder." Sistrunk App. 171. This account, Sistrunk says, omitted that no one was criminally charged for the homicide, that he was not suspected for the crime, and that a witness did not identify him as being present.

These alleged omissions do not amount to a deliberate or reckless concealment of facts both relevant to the magistrate's probable-cause inquiry and evincing a culpability worth the costs of suppression.[18] The context is important. Special Agent Endy filed his warrant application on September 22, 2014—only five days after the grand jury returned the second superseding indictment. The application "clearly was supported by much more than a 'bare bones' affidavit"—it "related the results of an extensive investigation" that had already led to Sistrunk's indictment on conspiracy and drug-trafficking charges. *Leon*, 468 U.S. at 926. Moreover, none of the supposedly omitted facts negates, or even substantially mitigates, the intended implication of the related facts actually adduced: that, as the affidavit asserted, Sistrunk "ha[d] a long history of membership in the Southside Gang and ha[d] consistently engaged in or ha[d] been associated with criminal activity including drug trafficking, firearm possession and violence." Sistrunk App. 174. As a result, Special Agent Endy's failure to include the facts does not evince the level of culpability necessary to

_____

[18] In *Brown*—which concerned *Franks* prong one—we held that the standard of review for assertions is clear error, reasoning that a district court's requisite determination is "essentially factual." *See* 631 F.3d at 642, 644-45. The parties here have not briefed us on the appropriate standard of review in the omissions context, and we find it unnecessary to resolve that question. Even if our review was de novo, we would still affirm the District Court's judgment.

trigger the exclusionary rule. The costs of suppression here would far outweigh any concomitant deterrence effect.

## B. Knowing Use of Perjured Testimony

During his testimony, Darvin Allen, one of the Government's principal witnesses, described a March 2009 episode of attack and retaliation between members of South Side and Parkway. Late one night at a club, Jahkeem Abney, a South Side member, got into a verbal dispute with some men from Parkway and was later shot in front of the club. A few days later, Allen recounted, several persons, including Atkinson, discussed how to respond to the shooting. Allen then testified that these same individuals drove up to Parkway and "engaged in gunfire" with Skylar Handy, one of the Parkway members at the club the night Abney was shot. App. 1647. On cross-examination, however, Atkinson's counsel, Yaninek, asked Allen if it would "make sense to [him]" that Atkinson was incarcerated in March 2009. App. 1801. Allen answered affirmatively and agreed that, as a result, Atkinson could not have been involved in the retaliatory shooting.[19] Later, during the defense portion of the trial, Yaninek questioned Special Agent Endy, who had prepared Allen for trial. Endy acknowledged that his report of investigation included Allen's identification of Atkinson at the retaliatory shooting, and he accepted that

---

[19] Yaninek had earlier, at a sidebar conversation during direct examination, moved for a mistrial on the basis of the inaccuracy. (Though he mistakenly said the testimony placed Atkinson at the club in possession of a gun, rather than simply at the retaliation.) The District Court denied the motion, declaring the issue "the proper subject of cross-examination" and not "grounds for a mistrial." App. 1664. Atkinson does not appeal the District Court's decision to allow the error to be resolved on cross.

43

this was impossible, but he did not recall Allen testifying to that effect.

Atkinson now asks for a new trial, contending that the Government knew of Allen's error and chose not to correct it. The Supreme Court has long maintained that under the Due Process Clauses, the prosecution may neither present nor withhold known false evidence, nor "allow[] [such evidence] to go uncorrected when it appears." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); and *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Yet such a violation, if established, does not alone warrant a new trial; there must also be prejudice (or materiality). *See Giglio*, 405 U.S. at 154 (citing *Napue*, 360 U.S. at 271); *see also Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). Accordingly, in cases of uncorrected false testimony, our Court requires a defendant to show four elements: (1) the witness committed perjury; (2) the government knew or should have known of the perjury; (3) the testimony went uncorrected; and (4) there is a reasonable likelihood the false testimony affected the verdict. *See Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). Atkinson's challenge fails at the first prong.

"A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). Allen's testimony was not limited to the night club incident; it ranged across several years and recounted multiple shootings involving a number of different persons. That Allen could not remember precisely who was present at the March 2009 retaliatory shooting is therefore unsurprising, and it does not in itself demonstrate willful intent.

44

Further, Atkinson presents no evidence that Allen, at the time of his direct testimony, knew that Atkinson was incarcerated in March 2009. *Compare Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 143, 146 (3d Cir. 2017), *with Hoffecker*, 530 F.3d at 183. Indeed, on cross-examination, when asked whether Atkinson was present at the retaliatory shooting, Allen replied that he knew Atkinson "committed a shooting at Skylar" Handy, but that he didn't "know if it was March because I think [Atkinson] went away." App. 1801. And when Allen was affirmatively presented with the fact of Atkinson's incarceration, he readily allowed it. Given this testimony, we cannot but conclude that Allen's initial identification of Atkinson was simply the result of a "faulty memory." *Hoffecker*, 530 F.3d at 183.

## C. Admission

The final category of evidentiary challenges concerns the admission and exclusion of evidence at trial. On multiple occasions, it is argued, the District Court ran afoul of the relevance provisions of the Federal Rules of Evidence by admitting evidence that either was unfairly prejudicial in excess of its probative value or served only to prove a Defendant's character. Several Defendants also challenge the District Court's admissions decisions regarding expert testimony. We perceive no error in any of these instances.

### 1. Relevance

We will disturb a district court's admission decision only if the court abused its discretion—if the decision "was arbitrary, fanciful or clearly unreasonable," such that "no reasonable person would adopt the district court's view." *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (internal citation omitted).

45

### *Kelly's Nickname*

The second superseding indictment included an alias, or street name, for each defendant. The one for Kelly was "Killer." App. 18. Early in the trial, his attorney filed a motion in limine objecting to the Government's use of the alias as unfairly prejudicial because it suggested extrinsic evidence that Kelly had committed murder. The Government countered that certain witnesses knew Kelly only through his alias, and that it would use the nickname only to identify Kelly, thus preventing jury confusion. The District Court agreed with the Government. It also, at the conclusion of the trial, included a limiting instruction to the jury on this issue. Kelly now seeks a new trial, arguing that the "probative value" of the nickname evidence was "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

Several of our sister circuits have long maintained that the prosecution's use of a defendant's alias in an indictment or at trial is permissible where the evidence is relevant—including for purposes of identifying the defendant—and does not result in unfair prejudice. *See, e.g.*, *United States v. Doe*, 741 F.3d 217, 227 (1st Cir. 2013); *United States v. Farmer*, 583 F.3d 131, 144-47 (2d Cir. 2009); *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001); *United States v. Delpit*, 94 F.3d 1134, 1146 (8th Cir. 1996); *United States v. Hines*, 955 F.2d 1449, 1454 (11th Cir. 1992); *United States v. Williams*, 739 F.2d 297, 299-300 (7th Cir. 1984). We agree, and adopt this standard here.

The District Court's judgment easily passes muster. Allen knew Kelly only by his nickname, and the District Court engaged in a reasonable balancing of the testimony's relevance with the nickname's potential to generate unfair prejudice. Kelly points to no instance where either Allen or a later witness

in the same position was able to identify him by anything else, nor does he indicate any moment where the Government used the alias to do anything other than identify him in a witness's testimony.[20] Further, the District Court fortified its Rule 403 balancing by including the limiting instruction. We perceive no abuse of discretion in this course of events.

### *The Latham Homicide*

A few hours after midnight on November 17, 2012, a Harrisburg man named Christen Latham died of a gunshot wound to the chest in the parking lot outside a York restaurant known as MoMo's. A verbal dispute inside the restaurant spilled out into the parking lot, where Latham was at first severely beaten by several men and then fatally shot. Police later identified Hernandez, Cruz, Kelly, and Schueg as either involved in or at least present at the altercation,[21] but no charges were ever filed.

The Government sought at trial to introduce evidence suggesting the involvement of several defendants in the altercation, including testimony that Hernandez threw the first punch and circumstantial evidence that Kelly was the one who killed Latham. Hernandez filed a joint motion in limine to exclude all the evidence, arguing that it was inadmissible under Federal Rules of Evidence 402, 403, and 404(b). The District

---

[20] Kelly asserts that the Government "prompted" Cordaress Rogers to use the nickname although Rogers clearly knew Kelly's given name. Kelly Reply Br. at 4. We do not read the testimony that way. It is clear from the context that the Government was seeking to elicit Kelly's surname, and not his nickname.

[21] Rogers testified at trial that Sistrunk told him that he also was present.

47

Court denied the motion, ruling that the evidence was intrinsic to the RICO-conspiracy offense charged at Count I and that any danger of unfair prejudice did not substantially outweigh the evidence's probative value. Seven Defendants[22] now contest one or both aspects of that ruling.

Intrinsic evidence need not be analyzed under Rule 404(b) because it is not "[e]vidence of any crime, wrong, or other act," Fed. R. Evid. 404(b)(1), but rather "part and parcel of the charged offense," *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010). We have, however, limited "the 'intrinsic' label [to] two narrow categories of evidence": (1) where the uncharged conduct "directly proves the charged offense"; and (2) where it is "performed contemporaneously with the charged crime" and "facilitate[s] the commission of the charged crime." *Id.* at 248-49 (internal quotation marks omitted). This suggests that the nature and scope of the evidence able to be deemed intrinsic will vary with the charged offense. In particular, where a criminal conspiracy is charged, courts have afforded the prosecution considerable leeway to present evidence, even of unalleged acts within the indictment period, that reflects a conspiratorial agreement or furtherance of the conspiracy's illegal objectives. *See, e.g.*, *United States v. Bush*, 944 F.3d 189, 196-97 (4th Cir. 2019); *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam); *United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011); *United States v. Parker*, 553 F.3d 1309, 1314-15 (10th Cir. 2009); *see also* *United States v. Gibbs*, 190 F.3d 188, 218 (3d Cir. 1999) (holding to the same effect on plain-error review).

On this standard, the District Court here did not abuse its discretion. As we detail more fully below, both RICO and

[22] Hernandez, Kelly, Sistrunk, and Eatmon all argue the point in some form. Cruz, Villega, and Atkinson invoke Rule 28(i).

drug-trafficking conspiracy are ultimately grounded in the general principles of conspiracy law. The Latham evidence implicates several of the Defendants and goes to their willingness to engage in concerted illegal action, amounting at its most serious to murder. The argument that the evidence has nothing to do with drug trafficking and the South Side-Parkway rivalry is therefore inapposite. Conspiracy is a single crime, even if it embraces a multitude of ends to be achieved over a period of time, by means that are not themselves the subject of agreement among the conspirators. *See Frohwerk v. United States*, 249 U.S. 204, 209-10 (1919); *infra*, Section V.B.1. In this light, a reasonable person could agree with the District Court that the Latham evidence serves directly to prove the existence of RICO conspiracy among the Defendants.

The Defendants' Rule 403 challenges also fail. The fact that the evidence is intrinsic establishes its probative nature, and as the District Court pointed out, any evaluation of prejudicial effect here must be considered in the context of the totality of the evidence produced. "The jury," the District Court observed, "has heard extensive evidence of Defendants' and their alleged co-conspirators' drug trafficking and gun possession, gang membership, multiple shootings directed at their rivals, shootouts on public streets involving feuding rivals in which children are shot and even killed, and evidence of multiple murders." App. 15. We agree with this assessment, and conclude that the District Court did not abuse its discretion in balancing the probative value and danger of prejudice as it did.

### 2. Expert Testimony

It is well established that a district judge has a "general 'gatekeeping' obligation" with respect to all testimony based on specialized knowledge of some form. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Under Federal Rule of

Evidence 702, she must ensure that such testimony is both reliable and relevant, including under the standard laid down in Rule 403. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). The judge must also ensure that "an expert witness [does] not state an opinion about whether [a] defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). The Defendants here challenge two of the District Court's decisions under these rules. We review those decisions for abuse of discretion. *United States v. Davis*, 726 F.3d 434, 446 (3d Cir. 2013).

### Sistrunk's Tattoo

The second superseding indictment included allegations that several South Side members were affiliated with the Bloods. Prior to trial, the Government announced its intention to have John Havens, a Special Agent with the Federal Bureau of Investigation, testify as an expert on the Bloods, detailing among other things their organization and symbols. Anticipating a challenge to this proffer, the District Court held a *Daubert* hearing. And when during trial the motion to exclude came, the District Court ruled in a memorandum opinion that most of it was admissible, but it excluded (among other things) testimony "as to any individual defendant except in the abstract." D. Ct. Dkt. No. 860, at 11.

In support of its Blood-affiliation allegations, the Government sought to introduce depictions of a tattoo on Sistrunk's left bicep that read: "Live By The 5, Die By The [symbol of a gun]." App. 5127; Sistrunk App. 78. Special Agent Havens would not be shown the tattoo, the Government assured, but he would describe the significance of certain symbols, such as the number five. Sistrunk's attorney objected under Rule 403, arguing that this singled out his client in contradiction of the

50

*Daubert* decision. The District Court admitted the evidence, and Sistrunk now appeals.

We find no abuse of discretion in the District Court's decision. Cooperating witnesses identified Sistrunk as a Blood. Further, according to testimony of Special Agent Endy, when federal agents executed the search warrant of Sistrunk's home, they found a letter signed, "Hat Boy, Low Ridah, Brim, Kanye." App. 5016. Special Agent Endy testified that "Kanye" was Sistrunk's alias and that "Brim" was "a Blood set reference"—that is, a reference to a particular subgroup of Bloods. App. 5016. Sistrunk's argument that this testimony and evidence was minimal when compared to the voluminous trial record is irrelevant. At the very least, the testimony represents independent support, apart from the tattoo and Special Agent Havens's testimony, for the Government's theory was Sistrunk was affiliated with the Bloods.

Nor did the District Court's decision to admit the evidence unfairly single out Sistrunk in contradiction of the *Daubert* ruling. Under that decision, Special Agent Havens would not have testified as to Sistrunk in particular; the tattoo would have been introduced after Special Agent Havens's testimony, and the jury would have been allowed to infer, or not infer, a connection between the tattoo and the significance of the number five among certain Bloods. In fact, the point arguably became explicit only through the efforts of Sistrunk's attorney, who on cross-examination presented Special Agent Havens with a picture of the tattoo. Given this course of events, we are comfortable that a reasonable person could adopt the District Court's view.

### *The De La Cruz Criteria*

One of the defense's principal expert witnesses was Dr. Jesse De La Cruz, a former gang member who earned a doctoral degree studying the gangs of Stockton, California. While conducting that research, he developed a set of eight characteristics common to the gang members he studied. Upon completion of his degree, Dr. De La Cruz began to testify as an expert witness, determining whether a criminal defendant possessed all or most of the characteristics. He interviewed all twelve defendants and was prepared to say whether they met his criteria.

The Government challenged that proposed testimony under Rule 704(b). It argued that Dr. De La Cruz could discuss the eight characteristics and other matters, but that application of the characteristics to the defendants would "go directly to the intent of a particular person to be a member of a gang." App. 5752. The District Court agreed. It ruled that Dr. De La Cruz could provide an "overview of gang activities" as a response to Special Agent Havens, but that he could not discuss whether the defendants met the eight criteria. App. 5754. That, the District Court said, would amount to "testi[mony] as to a person's mental state or condition," and the danger for prejudice was substantial in comparison with its limited probative value. App. 5754-55. Joined by five others,[23] Atkinson contends that the District Court erred in excluding the testimony.

This was not reversible error. It may be true that Dr. De La Cruz's application of the eight criteria would not have constituted "the last step in the inferential process—a conclusion as to the [defendants'] mental state." *United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) (citation omitted). As we de-

---

[23] Cruz, Hernandez, Villega, Sistrunk, and Eatmon.

scribe in Section V.B.1 below, a RICO enterprise may still exist even if it does not amount to a gang, nor does gang membership in itself prove RICO conspiracy. Yet that distinction illustrates the problematic nature of the testimony. The probative value was minimal *unless* one associates gang membership with RICO conspiracy, and so any testimony to that effect would have served, as the District Court said, only to "confuse and mislead the jury." App. 5755. "The trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact." *Gibbs*, 190 F.3d at 211. In this light, we cannot say the District Court abused its discretion in excluding the testimony.

## V. SUFFICIENCY OF THE EVIDENCE

We turn now to a series of interlocking challenges to the sufficiency of the evidence supporting the jury's verdicts. The operative indictment charged all the Defendants in Counts I, II, and III: RICO conspiracy, 18 U.S.C. § 1962(d); drug-trafficking conspiracy, 21 U.S.C. § 846; and drug trafficking, 21 U.S.C. § 841(a), respectively. Seven Defendants—Cruz, Hernandez, Villega, Kelly, Atkinson, Sistrunk, and Eatmon—were convicted on Count I, and each now contests his verdict.[24] These same seven, plus Rice and Schueg, were convicted on Counts II and III.[25] All nine had drug quantities of 5 kilograms or more of powder cocaine and 280 grams or more of crack cocaine attributed to them, thus raising their mandatory minimum term of imprisonment to 10 years and the maximum term

---

[24] Cruz, Hernandez, Sistrunk, and Eatmon all argue the issue. Villega, Kelly, and Atkinson raise it through Rule 28(i).

[25] Williams was also convicted on Count III. He appeals only his sentence, on grounds other than drug quantity. *See infra* Section VI.A.1.

to life. *See* 21 U.S.C. § 841(b)(1)(A). Six of these nine—Hernandez, Villega, Rice, Kelly, Sistrunk, and Eatmon—now challenge the verdicts on Counts II and III.[26]

For the reasons that follow, we will affirm the judgments of conviction. We also shall affirm the jury's Count II drug-quantity verdicts insofar as they bear on the Defendants' statutory maximum terms of imprisonment.

## A. The *Rowe* Error

We begin with the legal framework governing our inquiry. Nearly three and a half years after trial, and after all the Defendants had been sentenced, our Court in *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019), clarified the effect of *Alleyne v. United States*, 570 U.S. 99 (2013), upon the distribution and possession elements of § 841(a)(1). We held that the provisions of § 841(b)(1)(A) and (b)(1)(B) attach to each discrete act of distribution or possession because they specify facts that increase the statutory penalty, and so, under *Alleyne*, constitute an "element of a distinct and aggravated crime," 570 U.S. at 116, that must be submitted to the jury, *see Rowe*, 919 F.3d at 759. As a result, the jury may not "combine the amounts distributed or possessed" at discrete instances to find the drug

---

[26] On Count II, Hernandez, Villega, Rice, and Sistrunk argue the issue in some form, while Kelly and Eatmon raise it through Rule 28(i). Hernandez, Villega, and Rice also argue Count III; Kelly, Sistrunk, and Eatmon all invoke Rule 28(i). In an addendum to his opening brief, Hernandez challenged his conviction on Count VI by incorporating without explanation Villega's argument as to Count II. This was an improper adoption. At least in this context, we fail to see how a Rule 28(i) incorporation of a co-defendant's argument on a *different* count is applicable, absent elaboration that was not provided.

quantities specified in § 841(b)(1)(A) and (b)(1)(B). *Id.* at 761.

The parties agree that under *Rowe* the evidence was insufficient to support the Count III verdicts attributing to the Defendants the § 841(b)(1)(A) quantities. The jury here was charged on an aggregation theory of § 841(a)(1). The parties contest, however, our standard of review of that error. Further, two Defendants argue that *Rowe* also affects the jury's drug-quantity attributions on Count II—drug-trafficking conspiracy. We will address each argument in turn. We conclude that remedial action on the Count III error is warranted only if the Defendants' terms of imprisonment would have been different absent the error. Further, we conclude that an aggregation error did occur on Count II, but only as it regards the Defendants' mandatory minimum terms of imprisonment, and that the same standard of review applies as for the *Rowe* error on Count III.

### 1. Standard of Review

When a new rule is issued during the pendency of a direct criminal appeal, it is the appellate court's duty to "apply the law in effect at the time it renders its decision." *United States v. Johnson*, 899 F.3d 191, 199 (3d Cir. 2018) (quoting *Henderson v. United States*, 568 U.S. 266, 271 (2013)). But that does not necessarily determine our standard of review. Sistrunk contends that his Rule 29 motion at the close of the Government's case in chief sufficiently preserved the issue. We disagree.

The standard for preserving an argument on a Rule 29 motion remains an open question in our circuit. In *United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013), we drew a distinction between "issues" and "arguments," noting that the former "can encompass more than one of the latter." *Id.* at 340. We then held that, in the evidence-suppression context, "for parties to preserve an argument for appeal, they must have

raised the same argument in the District Court—merely raising an issue that encompasses the appellate argument" results in waiver of the argument. *Id.* at 337 (emphases omitted). The Government invites us to apply this standard here.

Nearly all of our sister circuits, though, have settled on a somewhat different standard. One has said that when a defendant makes "general motions pursuant to Rule 29 for acquittal, generally arguing that the government presented insufficient evidence," he has "preserved his sufficiency claims for appeal." *United States v. Hoy*, 137 F.3d 726, 729 (2d Cir. 1998). Others have maintained that "[w]hen a defendant raises specific grounds in a Rule 29 motion, grounds that are not specifically raised" are subject to some form of plain-error review, if not waived, on appeal. *United States v. Chong Lam*, 677 F.3d 190, 200 (4th Cir. 2012) (emphasis omitted).[27] A plurality of circuits has explicitly adopted both of these standards.[28] Only the Fifth Circuit applies a *Joseph*-like standard in the Rule 29 context. *See United States v. McDowell*, 498 F.3d 308, 312-13 (5th Cir. 2007).

We think uniformity in federal criminal practice has value, and so we decline to import *Joseph* wholesale here. It is unnecessary, though, to diverge too far from *Joseph* and hold

---

[27] *See also United States v. Samuels*, 874 F.3d 1032, 1036 (8th Cir. 2017); *United States v. Baston*, 818 F.3d 651, 663-64 (11th Cir. 2016).

[28] *See United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018); *United States v. Marston*, 694 F.3d 131, 134 (1st Cir. 2012); *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012); *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010); *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007); *United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998).

that a broadly stated Rule 29 motion preserves all arguments bearing on the sufficiency of the evidence. It is enough to accept here that when a Rule 29 motion raises specific grounds, or arguments (in the *Joseph* sense), all such arguments not raised are unpreserved on appeal. Sistrunk's motion raised a narrow factual argument regarding the testimony of a witness. That is a specific ground distinct from the *Rowe* argument, rendering the latter unpreserved. Our principal divergence from *Joseph* comes in how to treat the error: we will review for plain error.[29]

The parties agree that *Olano*'s first and second prongs are satisfied, and so our focus is on the substantial-rights inquiry. In *Vazquez*, we confronted a § 841 violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000): "the drug quantity [wa]s not found by a jury beyond a reasonable doubt and the defendant's sentence under § 841 exceed[ed] 20 years." 271 F.3d at 98. Because this violation involved both a sentencing error and a trial error, our substantial-rights inquiry asked whether "the sentence would have been the same absent the trial error." *Id.*

---

[29] The circuits are more divided on this question than on the preservation standard itself. One accepts full waiver, *Porter*, 886 F.3d at 566; two review for "a manifest miscarriage of justice," *Chong Lam*, 677 F.3d at 200 n.10; *Graf*, 610 F.3d at 1166; one looks for "clear and gross injustice," *Marston*, 694 F.3d at 134; and five review for plain error, *Samuels*, 874 F.3d at 1036; *Baston*, 818 F.3d at 664; *Hosseini*, 679 F.3d at 550; *Goode*, 483 F.3d at 681; *Spinner*, 152 F.3d at 955. Our Court has in the past reviewed unpreserved sufficiency arguments for plain error. *See United States v. Husmann*, 765 F.3d 169, 172, 173 n.2 (3d Cir. 2014); *United States v. Sussman*, 709 F.3d 155, 162 (3d Cir. 2013). Given this practice, and the nature of the error here, we think plain-error review is appropriate.

at 101 (emphases omitted).

A similar approach is appropriate here. A *Rowe* error's principal effect goes to the sentence imposed. The "aggravated crime," *Alleyne*, 570 U.S. at 116, charged in Count III encompasses the "lesser included offense" of a "[v]iolation of § 841(a)(1)," *Burrage v. United States*, 571 U.S. 204, 210 n.3 (2014). The default penalty for that offense is specified in § 841(b)(1)(C). As a result, any prejudice arising from the *Rowe* error concerns the length of the Defendants' incarceration rather than the integrity of the general verdicts against them.[30] And we may assume that any additional day an error causes a person to spend in prison affects his substantial rights. *See, e.g.*, *Molina-Martinez*, 136 S. Ct. at 1345.

To determine whether the Defendants' sentences would have been different absent the *Rowe* error, we may look in the first instance to the evidence supporting the verdicts on Count II—drug-trafficking conspiracy under 21 U.S.C. § 846.[31] As noted, the six challengers to Count III are the same six who

[30] No Defendant challenges his conviction of the lesser included offense of simple distribution. The *Rowe* error therefore did not affect the Defendants' substantial rights regarding the $100 assessment for felony convictions pursuant to 18 U.S.C. § 3013(a)(2)(A). *See United States v. Tann*, 577 F.3d 533, 539-40 (3d Cir. 2009).

[31] RICO caps violations at 20 years' imprisonment unless "the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). Here, the alleged predicate offenses were violations of § 841(a)(1) at the § 841(b)(1)(A) quantities—for which the maximum penalty is life imprisonment. The conceded *Rowe* error therefore necessarily infects the validity of the sentences on Count I.

contest their convictions on Count II. These six were sentenced to concurrent terms of imprisonment on both counts. *See supra* Section I.D. If the evidence is sufficient to support the jury's drug-quantity attributions on Count II—and, in particular, the resulting maximum term of imprisonment under § 841(b)(1)(A)[32]—then vacating the drug-quantity verdicts on Count III would not result in reduced sentences. It would, therefore, be unnecessary for us to correct the *Rowe* error.

## 2. Section 846 Conspiracy and Drug Quantity: The Legal Standard

Hernandez and Sistrunk contend that *Rowe* and *Alleyne* also affect our evaluation of the evidence supporting the drug-quantity verdicts on Count II. In particular, they argue that those decisions either transformed drug quantity into a *mens rea* element of § 846, or barred the aggregation of drug quantity for sentencing purposes under § 846. We reject the first argument, but qualifiedly agree on the second. We hold that a jury, in determining drug quantity for purposes of the mandatory minimum term of imprisonment, may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of the conspiracy, or in furtherance of it, and were reasonably foreseeable to the defendant as a natural consequence of his unlawful agreement.

### *Mental Element*

Section 846 does not demand that a person conspire to distribute a particular quantity of a controlled substance. To see why, we must begin with the underlying statute. Under

---

[32] The statutory maximum term under § 841(b)(1)(C) is still greater than § 841(b)(1)(A)'s mandatory minimum, absent other aggravating facts—such as a prior serious drug felony conviction—that would apply anyway under (b)(1)(C).

§ 841(a)(1), "it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute, or . . . possess with intent to . . . distribute, . . . a controlled substance." This is the core offense—the interdiction backed by the state's claim to a monopoly of legitimate physical violence. Section 841(b) makes this clear: it describes the penalties to be imposed upon "any person who violates subsection (a) of this section." 21 U.S.C. § 841(b). Properly speaking, then, a person who engages in drug trafficking violates § 841(a), and the penalty for that violation is to be determined according to § 841(b), which provides both a default penalty and heightened penalties based on certain additional factual findings. As a result, it is unnecessary for the jury to find that the defendant knew the quantity of the controlled substance he was distributing, or possessing with intent to distribute, at a given time. It is enough that the knowing or intentional distribution or possession occurred; the quantity is a factual finding that goes to the sentence to be imposed. *See Burrage*, 571 U.S. at 210-11 (interpreting § 841(b)(1)(C)'s "results from" enhancement as "impos[ing] . . . a requirement of actual causality," rather than legal causality, and thus as requiring a factual finding of but-for causation); *United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014).

This interpretation is consistent with *Apprendi* and *Alleyne*. The Court in those cases operated on an expansive definition of "crime" according to its "invariable linkage" with punishment, *Apprendi*, 530 U.S. at 478, rather than specifically the conduct and mental state deemed illegal. Yet the decisions did not fundamentally affect legislative authority to define a crime's elements. In *Apprendi*, for example, the Court noted that traditionally, an indictment under a criminal statute that "annexe[d] a higher degree of punishment to a common-law felony, if committed under particular circumstances," needed to charge both "the circumstances of the crime and the intent

of the defendant at the time of commission," and "the circumstances mandating [the higher] punishment." *Id.* at 480 (quoting John Archbold, *Pleading and Evidence in Criminal Cases* 51 (15th ed. 1862)). Both were "essential elements to be alleged," *id.*, but a prosecutor could fail to prove the latter and still prove that the felony had been committed, *id.* at 480-81 (citing Archbold, *supra*, at 188). As a result, although bundled in the broader concept of an "aggravated" crime, the statutory definitions of "[t]he core crime" and the "triggering" fact remain the same. *Alleyne*, 570 U.S. at 113. In the context of § 841(a) and (b), that means the defendant need not consciously cognize the amount he is distributing in order to violate the law.

The same logic applies to drug-trafficking conspiracies under § 846. The statute provides: "Any person who . . . conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." In the case of a drug-trafficking conspiracy, the "offense" conspired is a violation of § 841(a), and the penalty for this distinct crime—conspiracy to violate § 841(a)—is provided in § 841(b). For the same reason, then, that drug quantity is not a *mens rea* element under § 841(a), it is not one under § 846.

### *Drug-Quantity Aggregation*

The Defendants alternatively argue that just as *Rowe* and *Alleyne* bar the aggregation of drug quantity for discrete violations of § 841(a)(1), so they also bar aggregation for violations of § 846. The Government responds by referring to *United States v. Gori*, 324 F.3d 234 (3d Cir. 2003), for the proposition that the penalty for drug-trafficking conspiracy under § 846 can be calculated according to the total amount of

drugs in the conspiracy. We agree with neither side fully. When determining drug quantity for purposes of a defendant's mandatory minimum sentence, a jury must follow the ordinary limitations on co-conspirator liability. Because that principle was not followed here, we conclude that an error occurred on the Count II drug-quantity verdicts.

In *Gori*, we recognized that the general principles of conspiracy law may influence a defendant's sentencing exposure under § 846. When Congress borrows a legal term of art in a criminal law, it is presumed to "know[] and adopt[] the cluster of ideas that were attached" to that term and "the meaning [the term's] use will convey to the judicial mind," absent provision to the contrary. *Morissette v. United States*, 342 U.S. 246, 263 (1952). Section 846 is a law of this type, and so our interpretation of it ought, where relevant, to have reference to the "well-established principles," *Salinas v. United States*, 522 U.S. 52, 63 (1997), of conspiracy law. *See, e.g.*, *Smith v. United States*, 568 U.S. 106, 110-11 (2013).

It is elementary that the "agreement to commit an offense does not become several conspiracies because it continues over a period of time." *Braverman v. United States*, 317 U.S. 49, 52 (1942). "[A] single continuing agreement to commit several offenses" is equally a violation of the relevant conspiracy statute as a one-off agreement to commit a single offense. *Id.*; *see also United States v. Kissel*, 218 U.S. 601, 607 (1910). *Gori* simply applied this principle in the context of a § 846 drug-trafficking conspiracy: one can conspire to violate § 841(a) multiple times, and this may constitute a single violation of § 846. 324 F.3d at 237. Moreover, because § 846 ties its penalty to that of the substantive offense, and because, by our foregoing logic, it is § 841(a) specifically that is conspired to be violated, *Gori*'s interpretation of how to penalize a multi-offense drug-trafficking conspiracy remains good law.

Yet, importantly, *Gori* concerned the aggregation of drug quantities arising from the offenses of *the same defendant*. *See* 324 F.3d at 236. Equally central to conspiracy law is the concept of co-conspirator liability. "It has always been, . . . and is still, the law that, after prima facie evidence of an unlawful combination has been introduced, the act of any one of the co-conspirators in furtherance of such combination may be properly given in evidence against all." *Bannon v. United States*, 156 U.S. 464, 469 (1895). The "unlawful agreement contemplated precisely what was [to be] done," it "was formed for the purpose" of committing a crime or crimes, and so the "act of one partner in crime is attributable to all." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). Although thus expanding liability, this logic contains its own limiting principle: the act must be "done in furtherance of the conspiracy," or "fall within the scope of the unlawful project." *Id.* at 647-48. A "ramification[] of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement" does not bind the co-conspirator. *Id.* at 648. "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938) (L. Hand, J.).

These principles inform the extent of a defendant's sentencing exposure under § 846. In a post-*Apprendi* case, we held that in prosecutions of multi-person drug-trafficking conspiracies, "[t]he [jury's] finding of drug quantity for purposes of determining the statutory maximum is . . . to be an offense-specific, not a defendant-specific, determination." *United States v. Phillips*, 349 F.3d 138, 143 (3d Cir. 2003), *vacated on other grounds sub nom. Barbour v. United States*, 543 U.S. 1102 (2005). In other words, the jury finds only the quantity attributable to "the conspiracy as a whole," and then the sentencing

judge determines "the drug quantity attributable to each defendant and sentence[s] him or her accordingly, provided that the sentence does not exceed the applicable statutory maximum." *Id.* "Accomplice attribution," we recognized long before *Phillips*, "often results in a dramatic increase in the amount of drugs for which the defendant is held accountable, which translates directly into a dramatic increase in the sentence." *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992). And so, "at sentencing, it is essential for courts to conduct 'a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in a conspiracy to ensure that the defendant's sentence accurately reflects his or her role.'" *United States v. Metro*, 882 F.3d 431, 439 (3d Cir. 2018) (alterations omitted) (quoting *Collado*, 975 F.2d at 995).

*Phillips*'s holding did not apply to mandatory minimum sentences. We adopted in that case the reasoning of three of our sister circuits, *see Phillips*, 349 F.3d at 141-42 (citing *United States v. Knight*, 342 F.3d 697, 710-11 (7th Cir. 2003); *United States v. Turner*, 319 F.3d 716, 722-23 (5th Cir. 2003); and *Derman v. United States*, 298 F.3d 34, 42-43 (1st Cir. 2002)), and those courts do not employ a conspiracy-wide approach in the context of mandatory minimums, *see United States v. Haines*, 803 F.3d 713, 741-42 & n.9 (5th Cir. 2015); *United States v. Colón-Solís*, 354 F.3d 101, 103 (1st Cir. 2004); *Knight*, 342 F.3d at 711. *Phillips* said nothing to the contrary, consistent with *Collado*: the jury sets the maximum according to the total amount of drugs in the conspiracy, and the sentencing judge conducts an individualized inquiry to determine the penalty for each co-conspirator.

*Alleyne* alters this regime. Since that decision, several circuits—including the First and the Fifth—have held that the

jury, in determining (as *Alleyne* requires) drug quantity for purposes of the mandatory minimum, may attribute to a defendant only that "quantity which was within the scope of the agreement and reasonably foreseeable to him." *United States v. Dewberry*, 790 F.3d 1022, 1030 (10th Cir. 2015) (internal quotation marks omitted); *see also United States v. Stoddard*, 892 F.3d 1203, 1221 (D.C. Cir. 2018); *Haines*, 803 F.3d at 740; *United States v. Rangel*, 781 F.3d 736, 742-43 (4th Cir. 2015); *United States v. Pizarro*, 772 F.3d 284, 292-93 (1st Cir. 2014).[33]

We adopt here a similar, though not the same, approach. The jury, when determining drug quantity for purposes of the mandatory minimum, may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a consequence of the unlawful agreement.[34] We take this approach for two reasons.

*First*, it follows from the basic principles of our prece-

---

[33] The Sixth Circuit has adopted the conspiracy-wide approach for statutory minimum and maximum sentences. *See United States v. Gibson*, No. 15-6122, 2016 WL 6839156, at *1 (6th Cir. Nov. 21, 2016) (citing *United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008)), *aff'd by an equally divided court*, 874 F.3d 544 (6th Cir. 2017) (mem).

[34] The quantity of drugs for which conspirators can be held accountable is not limited to amounts distributed or possessed with intent to distribute. It also includes amounts that conspirators agreed to distribute or possess with intent to distribute, even if those amounts were not actually distributed or possessed.

dent. In *Rowe*, we acknowledged that because the drug quantities specified in § 841(b)(1)(A) and (b)(1)(B) increase the mandatory minimum, they constitute facts that must be submitted to the jury for each violation of § 841(a)(1). *Gori* is consistent with *Rowe* because conspiracy law encompasses a continuing agreement to commit several offenses, and so the penalty for a violation of § 846 is appropriately calculated according to the aggregate drug quantity involved in a defendant's continuous execution of the unlawful agreement. Under *Alleyne*, the jury must determine this quantity to set the mandatory minimum. Our holding here follows from the same rationale, applying to this landscape another dimension of conspiracy law—co-conspirator liability—that must be considered by the jury. Where *Gori* held that the drug quantities involved in a single conspirator's multiple violations of § 841(a) may be aggregated for purposes of his sentence, we hold that the quantities involved in the § 841(a) violations of multiple conspirators may be aggregated for determining the mandatory minimum of any one conspirator, subject to the ordinary limitations on co-conspirator liability.[35]

---

[35] *Pinkerton* concerned liability for a distinct substantive offense committed by a co-conspirator in furtherance of the conspiracy, rather than liability for the conspiracy offense itself. However, its holding was simply an extension of an already well-established principle that the act of a co-conspirator in furtherance of the scheme is the act of all for purposes of conspiracy liability. *See Pinkerton*, 328 U.S. at 647. Our holding here applies that idea to the § 846 drug-trafficking context. Further, we think *Pinkerton*'s limitations on co-conspirator liability apply to liability not only for a co-conspirator's substantive offense, but also under the relevant conspiracy statute. *See, e.g.*, *Peoni*, 100 F.2d at 403.

*Second*, the approach is most consistent with our pre-*Alleyne* regime. *Phillips* ensured that the jury would set the maximum term a defendant could spend in prison, leaving it to the judge to determine each co-conspirator's individual sentencing exposure under § 841(b). Here we transfer some of that latter inquiry to the jury, as *Alleyne* requires. Yet in doing so, we must necessarily alter it. Under *Collado*, the judge at sentencing must "consider whether *the amounts* distributed by the defendant's co-conspirators . . . were reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." 975 F.2d at 995 (internal quotation marks omitted) (emphasis added). But as we have said, drug quantity is not a *mens rea* element under § 846, and co-conspirator liability extends to acts or omissions that are reasonably foreseeable as a consequence of the unlawful agreement. Accordingly, we think the proper inquiry is to determine the *violations* of § 841(a) within the scope of the conspiracy, or in furtherance of it, that were reasonably foreseeable to the defendant as a natural result of his unlawful agreement. All drug quantities involved therein are attributable to the defendant.[36]

---

[36] *Collado*'s specification that drug quantity itself needed to be reasonably foreseeable was based on an application note of U.S.S.G. § 1B1.3. And "[w]e have . . . explained that the conduct a defendant is typically held responsible for under the guidelines is not coextensive with conspiracy law." *Metro*, 882 F.3d at 439 (internal quotation marks omitted). Moreover, in 2015, the Sentencing Commission amended the relevant application note so that it now reads: "With respect to offenses involving contraband (including controlled substances), the defendant is accountable [for] . . . all quantities of contraband that were involved in transactions carried out by other participants,

We thus agree with Hernandez and Sistrunk that an error occurred as to Count II. The jury rendered its verdicts by considering only the amount of drugs involved in the conspiracy as a whole. But for the same reasons given above with respect to the *Rowe* error on Count III—the drug-trafficking count—this argument was not preserved in the Defendants' Rule 29 motions, and so our review is for plain error. We may assume that *Olano*'s second prong is satisfied. On the third prong, our logic with respect to the *Rowe* error applies similarly here. The error goes to the sentences imposed, and because (as we hold below) the Count II verdicts otherwise stand, we may determine whether there is "a reasonable probability that, but for the error claimed," the Defendants' terms of imprisonment would have been different. *Dominguez Benitez*, 542 U.S. at 82 (alteration and citation omitted).[37] Further, given our conclusions in Part VI below, with one exception,[38] the Defendants' sentences include incarceration in excess of § 841(b)(1)(A)'s mandatory minimum. The error, then, did not affect their substantial rights.

## B. Count I: RICO Conspiracy

Having clarified the legal framework of our inquiry, we now turn to the sufficiency of the evidence on Counts I and II—RICO conspiracy and drug-trafficking conspiracy. Both offenses may arise from the same set of facts because they follow from the general principles of conspiracy law. Here, the operative indictment incorporated its allegations at Count I as

---

if those *transactions* . . . were reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 cmt. n.3 (emphasis added).

[37] Our discussion above of the $100 assessment for felony convictions, *see supra* note 30, thus also applies here.

[38] Hernandez. *See infra* Section VI.A.2.

the basis for its charge at Count II. And, as we shall see, the evidence supporting the Count I convictions overlaps with that supporting the convictions on Count II.[39] We hold that a rational juror could have concluded that each of the Defendants convicted on Count I was guilty as charged.[40]

### 1. The Elements of the Offense

#### *Conspiracy Generally*

The fountainhead of any criminal conspiracy is the agreement: when "two or more . . . confederate and combine together, by concerted means, to do that which is unlawful or criminal." *Callan v. Wilson*, 127 U.S. 540, 555 (1888). Under both the RICO- and the drug-trafficking-conspiracy statutes, 18 U.S.C. § 1962(d) and 21 U.S.C. § 846, "the Government must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy)." *Smith*, 568 U.S. at 110. The statutes are therefore "even more comprehensive than the general conspiracy offense in [18 U.S.C.] § 371" because they do not require an overt act. *Salinas*, 522 U.S. at 63; *see also United States v. Shabani*, 513 U.S. 10, 17 (1994).

Further, the RICO or drug-trafficking conspiracy may continue over time and embrace a multitude of objects. *Smith*,

---

[39] Of the six Defendants raising a sufficiency challenge on Count II, only Rice was not convicted on Count I. We address the evidence supporting his conspiracy conviction in Section V.C.2 below.

[40] We consider here only the sufficiency of the evidence supporting the jury's general verdicts on Count I—commission of the substantive offense. *See supra* note 31.

69

568 U.S. at 111. It may exist even if an individual conspirator "does not agree to commit or facilitate each and every part of the" contemplated crime or crimes. *Salinas*, 522 U.S. at 63. Nor even must the conspiracy actually achieve any or all of its criminal ends. *United States v. Rabinowich*, 238 U.S. 78, 86 (1915). It is enough that the conspirator "intend[s] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65.

Thus involved, each conspirator is subject to the ordinary principles of co-conspirator liability. *Smith*, 568 U.S. at 111 (citing *Pinkerton*, 328 U.S. at 646). And he continues to be liable "up to the time of abandonment or success." *Kissel*, 218 U.S. at 608. Indeed, "a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it." *Smith*, 568 U.S. at 114; *see also Callanan v. United States*, 364 U.S. 587, 593 (1961) ("Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish."). Once the prosecution has proved both the existence of a conspiracy across a period of time and the defendant's participation in that conspiracy, the burden falls on the defendant to establish his withdrawal prior to the completion of the period. *Smith*, 568 U.S. at 113. If he does not show "some [affirmative] act to disavow or defeat the purpose" of the conspiracy, then he must "incur the guilt" attendant upon its continuance. *Hyde v. United States*, 225 U.S. 347, 369-70 (1912).

### *Section 1962(c)*

Seven Defendants were convicted of conspiracy to violate 18 U.S.C. § 1962(c). That provision declares in relevant part:

It shall be unlawful for any person . . . associated

with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

For our purposes here, the final two elements are the most significant: participation in (1) the conduct of an enterprise (2) through a pattern of racketeering activity.

RICO defines an "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In the present cases, the enterprise was said to be the "Southside Gang," which was "a group of individuals associated in fact." App. 25. The jury was charged and returned its verdicts on this theory. Despite considerable dispute at trial and in the briefs before us, the term "gang" has no talismanic significance in the RICO context. An association-in-fact enterprise, the Supreme Court has said, is "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). This definition entails "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Beyond this the proof need not go: "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.* at 948.

Next, "racketeering activity" is said to "mean[]" certain criminal acts defined by statute, including "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled

71

substance." 18 U.S.C. § 1961(1)(D). A "pattern of racketeering activity" in turn "requires at least two acts of [such] activity, . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *Id.* § 1961(5); *see H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ("[A] . . . prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." (emphasis in original)). Although the evidence establishing an enterprise and a pattern of racketeering activity "may in particular cases coalesce," the two elements themselves remain "at all times" distinct. *Turkette*, 452 U.S. at 583.

### Section 1962(d)

As relevant here, to be liable for RICO conspiracy under § 1962(d), a defendant must "intend to further an endeavor which, if completed, would satisfy all of the elements of [§ 1962(c)]." *Salinas*, 522 U.S. at 65. That endeavor may be both the enterprise and the conspiracy, for the two crimes can be "coincident in their factual circumstances." *Id.* It is a "person," not the enterprise itself, who violates § 1962(c) by "conduct[ing] or participat[ing]" in the enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011) (citing *H.J. Inc.*, 492 U.S. at 244). The nature of the liability therefore depends upon the circumstances. A defendant may be a party to the enterprise, not violate § 1962(c), but still be liable under § 1962(d). He need not "commit or agree to commit the two or more predicate acts requisite to [§ 1962(c)]." *Salinas*, 522 U.S. at 65. Nor even, thanks to the absence of an overt-act requirement, must one of his co-conspirators actually violate § 1962(c). *See id.* at 63. It is enough that the defendant "knew about and agreed to facilitate the scheme" which at least would have resulted in the satisfaction of § 1962(c)'s elements. *Id.* at

66; *see also United States v. Fattah*, 914 F.3d 112, 164 (3d Cir. 2019).

Thus, consistent with the general principles of conspiracy law recited above, conspiracy to violate § 1962(c) requires: (1) that two or more persons agree to further an enterprise whose activities affect or would affect interstate or foreign commerce, and whose execution results or would result in a person conducting or participating directly or indirectly in the enterprise's affairs through a pattern of racketeering activity; (2) that the defendant was a party to or a member of this agreement; and (3) that the defendant joined the agreement knowing of its objectives and with the intention of furthering or facilitating them. *See United States v. John-Baptiste*, 747 F.3d 186, 207 (3d Cir. 2014).

## 2. The Evidence

In any review of the sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S 307, 319 (1979) (emphasis in original). The Government may prove the existence of a conspiracy entirely through circumstantial evidence. *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986). In such instances, we sustain the verdict if the proof "appears as a reasonable and logical inference" from "evidence of related facts and circumstances." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (citation omitted). And we "must credit all available inferences in favor of the government." *Fattah*, 914 F.3d at 162 (citation omitted).

The Defendants—Cruz, Hernandez, Villega, Kelly, Atkinson, Sistrunk, and Eatmon—contend that the alleged South

73

Side gang did not amount to an enterprise for purposes of RICO liability. They point to testimony that the South Side was simply a neighborhood where the Defendants grew up or lived; that the drug dealing that occurred there amounted at best to parallel conduct by independent actors; and that any violent incidents were the product of personal "beefs."

It is undeniable that the drug dealers operating on the South Side during the indictment period did not constitute a gang on the order of the Bloods or Crips. Nor was this a trafficking operation to rival the 'Ndrangheta. Yet that is not what RICO requires. The evidence need only support the conclusion that each of these seven Defendants at least agreed to further a continuing unit that functioned with a common illegal purpose.

Testimony showed that as early as 2002, Cruz, Hernandez, and Kelly supplied crack to Atkinson and Eatmon in the area around Maple and Duke. App. 3543-47, 3633-34; *see also* App. 1503-07. Hernandez and Kelly also, it was said, helped to introduce guns to the South Side, at least partially in response to fighting with Parkway. App. 3553. A few years later, Sistrunk began selling drugs at Maple and Duke. App. 3559-60. By that time, however, Cruz, Hernandez, and Kelly had been incarcerated, and so Atkinson, Eatmon, and Sistrunk, among others, began collectively to traffic in large quantities of crack. App. 3570-75, 3830-31; *see also* App. 2110-11; 3138-39. Their profits were all earned separately, App. 3817-18, but nevertheless the men sometimes shared scales and bought or fronted drugs among each other, App. 3574.

This association persisted into the next decade. *See, e.g.*, App. 2456-57. In June 2011, while in prison, Villega told Warren Pillgreen to "straighten out that package," referring to a drug debt Pillgreen owed to Hernandez. App. 3016. A few months later, shortly before Pillgreen's release from prison,

Cruz engaged him to "commit an act of violence" to settle the debt. App. 3018. By 2012, Cruz and Hernandez were still supplying substantial amounts of crack, and Kelly was present for these transactions. App. 3644-48. In September, Cruz, Hernandez, Kelly, Atkinson, and Eatmon were involved in a physical altercation between South Side and Parkway at Rutter's gas station. App. 3649-63. The Latham homicide occurred just over two months later—an event, we have seen, in which Hernandez, Cruz, Kelly, and perhaps Sistrunk played a part. App. 36370-71; 3859-61. Finally, in early 2014, Villega's floormate at a halfway house worked with him to sell heroin, and occasionally observed him with other individuals coming to and from the house's basement. App. 4513-16. When police later searched the house, they discovered approximately 13.5 grams of heroin and 61 grams of crack in the basement, and a photograph in Villega's bedroom of himself, Cruz, and Hernandez. App. 4561, 4567-68.

A rational juror could conclude from this evidence—and, more generally, from the entire body of evidence—that each of the seven challengers agreed to further an enterprise whose predominant common purpose was "making money" through the sale of controlled substances, but which also occasionally embraced related ends, such as "protecting its own members and criminal schemes." *See Bergrin*, 650 F.3d at 269. As noted, the conspiracy and the enterprise need not be distinct, and a continuing unit for purposes of RICO may exist even if a given Defendant was not always active. *See Boyle*, 556 U.S. at 948 ("[N]othing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence."); *see also Smith*, 568 U.S. at 114. Here, each of the Defendants persisted in the group's concerted illicit activities over an extended period of time, operating within the larger, if "relatively loose and informal," *Bergrin*, 650 F.3d at 269,

structure of the South Side's drug blocks. Based on this evidence, we cannot say that no rational juror would find the Defendants guilty of RICO conspiracy under § 1962(d).

## C. Count II: Drug-Trafficking Conspiracy

We proceed, finally, to the evidence supporting the convictions on Count II. Six Defendants—Hernandez, Villega, Rice, Kelly, Sistrunk, and Eatmon—challenge the sufficiency of this evidence. We hold that a rational juror could have found each of the challengers guilty under § 846 and attributed to him the § 841(b)(1)(A) quantities for purposes of his statutory maximum term of imprisonment.

### 1. The Elements of the Offense

We have already described some of the basic principles governing a defendant's liability under § 846 for participation in a drug-trafficking conspiracy. *See supra* Sections V.A.2, V.B.1. Our precedent and the foregoing discussion establish three basic elements that the jury must find beyond a reasonable doubt.

*First*, there must be a conspiracy—an agreement among two or more persons to achieve by concerted means an illegal goal. It has long been settled in our Court that to prove a drug-trafficking conspiracy, "the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal." *Gibbs*, 190 F.3d at 197. A conspiracy under § 846 becomes a drug-trafficking conspiracy when that common goal is a violation or violations of § 841(a). But "[t]he government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (internal quotation marks omitted). The agreement "is the essence of the of-

fense," and "the presence of certain facts often provides circumstantial evidence of the underlying agreement." *United States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001).

*Second*, the defendant must have been a member of the conspiracy. He must be shown to have intended to further a scheme whose execution he knew would or did result in the commission of each element of the substantive offense. Under this latter "knowledge" requirement, the government must prove "that the defendant had knowledge of the specific objective contemplated by the . . . conspiracy." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (en banc). In the present context, that means he must have known that the conspiracy would or did result in the distribution of a controlled substance.

Although the evidence establishing the existence of a conspiracy may coincide with proof of participation in that conspiracy, "certain types of circumstantial evidence become substantially more probative if it can be established that a conspiracy existed and the only remaining question is whether the defendant was a part of it." *Pressler*, 256 F.3d at 151. "[A] simple buyer-seller relationship," however, "without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *Gibbs*, 190 F.3d at 197. Rather, the "buyer" is liable under § 846 only if direct or circumstantial evidence shows that he knew "he was part of a larger operation." *United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994); *see also Gibbs*, 190 F.3d at 199-200 (listing several factors for making this determination).

*Third*, if the indictment charges drug quantities pursuant to § 841(b)(1)(A) or (b)(1)(B), then the statutory maximum term of imprisonment is to be determined according to the

amount of drugs involved in the conspiracy as a whole. *Phillips*, 349 F.3d at 143. The mandatory minimum, however, may be determined only according to the aggregate quantity of drugs involved in those violations of § 841(a) that were within the scope of the conspiracy, or in furtherance of it, and were reasonably foreseeable to the defendant as a natural consequence of his unlawful agreement. *See supra* Section V.A.2.

## 2. The Evidence

We proceed generally according to the sufficiency-of-the-evidence standard recited above. In cases of drug-trafficking conspiracy, "the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)).

The challengers contest the jury's verdicts on two grounds. First, they contend there was no evidence of an agreement either to form a conspiracy or to join one. Second, they dispute the evidence as to drug quantity. We consider each argument in turn.

### *Agreement*

Our foregoing discussion establishes the common foundation of RICO and drug-trafficking conspiracy in the general principles of conspiracy law. The two offenses may be coincident in their factual circumstances, especially where the pattern of racketeering activity involves "the felonious manufacture, . . . buying, selling, or otherwise dealing in a controlled substance." 18 U.S.C. § 1961(1)(D). In the present cases, our evaluation of the evidence supporting the Count I convictions of Hernandez, Villega, Kelly, Sistrunk, and Eatmon also applies here with regard to the requisite conspiratorial agreement. *See United States v. Rodríguez-Torres*, 939 F.3d 16, 30 (1st Cir. 2019) (resolving defendants' sufficiency challenges to drug-

trafficking-conspiracy convictions on the basis of a preceding resolution of their sufficiency challenges to their RICO-conspiracy convictions).

The only Defendant to challenge his Count II conviction who was not convicted on Count I is Rice. He argues that there is insufficient evidence showing that he ever joined the charged conspiracy—that he was, at most, a street-level dealer who abandoned that lifestyle upon his release from prison in 2013. The evidence in the record belies this argument. For example, Cordaress Rogers testified that he, Rice, Atkinson, Sistrunk, and Eatmon were "at one time in life . . . like[] brothers" and would hang out and sell drugs together every day around Maple and Duke. App. 3571. This went beyond friendship to mutual facilitation of drug trafficking. They would gather at each other's houses to sell drugs; they would buy drugs from each other or front them to each other when one ran out; they would share scales for measuring the drugs. App. 3572-74. They sold primarily to dealers, rather than users. App. 3830-31. Further, upon his release from prison in late July 2008, Rice returned to the South Side. At that point, Jerrod Brown identified Rice as handling guns and seeking retribution for the shooting of Jahkeem Abney outside the night club in mid-March 2009. App. 2113-14. Finally, Brown also testified that sometime after May 2013—which would have been shortly after Rice's release from prison—Rice supplied him with crack. App. 2163-64.

Based on this evidence, a reasonable juror could conclude that Rice was consciously and willingly a part of a larger drug-trafficking operation and remained so even after periods of imprisonment. *See Gibbs*, 190 F.3d at 200.

### *Drug Quantity*

A rational juror also could conclude that Hernandez,

Villega, Rice, Kelly, Sistrunk, and Eatmon were each responsible, on a conspiracy-wide basis, for 280 grams or more of crack cocaine. Rogers's testimony alone indicated that in the early years just after 2002, he received 1 kilogram of crack from each of Hernandez, Kelly, and Cruz. App. 3633-34. At that time, he was close with Atkinson, Rice, and Eatmon, who were receiving drugs from Hernandez and Kelly in similar quantities. App. 3543-45. Rogers also estimated that in later years, when he, Atkinson, Rice, Sistrunk, and Eatmon worked closely together, he would bring back from New York 500-1000 grams of crack "[e]very couple of days." App. 3573. He testified that in this time he distributed and saw his friends distribute "many kilos of crack." App. 3575. Moreover, to the extent that any of the Defendants were incarcerated and could not have been present for the movement of these quantities, their renewed drug dealing upon release from prison confirms their continuing liability for acts in furtherance of the conspiracy, even apart from the absence of an affirmative act of withdrawal. *See Hyde*, 225 U.S. at 369-70.

Finally, as noted above, Villega aided Hernandez in the collection of a drug debt by warning Pillgreen to "straighten out that package." App. 3016. Marquis Williams testified that Villega fronted him 6 grams of heroin in 2013. App. 2443-44, 2655. By early 2014, Villega was still dealing heroin, App. 4513-16, and police later recovered about 13.5 grams of heroin and 61 grams of crack from the basement Villega was seen to frequent with others. App. 4561. In just that timeframe, from 2011 to 2014, Rogers testified that he received 156 grams of crack from Cruz and Hernandez, App. 3645-46, and Marquis Williams said he sold 50-gram quantities of crack on "several" occasions, App. 2442. Based on this evidence alone, an attribution to Villega of over 280 grams of crack on a conspiracy-wide basis does not fall below the threshold of bare rationality.

***

There was sufficient evidence upon which a rational juror could have concluded that these six Defendants were guilty under § 846 and were responsible for 280 grams or more of crack. Because we reach this conclusion, we further conclude that the *Rowe* error on Count III did not affect their substantial rights. Their statutory maximum terms of imprisonment would have been life even if the *Rowe* error had not occurred.

## VI. SENTENCING

The final category of issues concerns the sentences imposed in the years following the trial. All the Defendants challenge various aspects of those judgments.[41] For the reasons that follow, we will affirm the judgments of sentence of Williams and Rice. But we will vacate Hernandez's judgment of sentence in full, the other Defendants' judgments of sentence in part, and remand the cases of Hernandez and Schueg for resentencing proceedings consistent with this opinion.

### A. Individual Challenges

### 1. Williams

Jabree Williams's Presentence Report (PSR) recommended a Guidelines range of 78-97 months in prison. The District Court sentenced him to 60 months, the mandatory min-

---

[41] Some Defendants have sought, pursuant to Rule 28(i), to adopt sentencing challenges of others. However, general adoptions or ones that concern an argument specific to the arguing party will not be regarded, if they are not accompanied by further elaboration. We refuse to speculate on how an issue applies to a Defendant's sentencing judgment when he himself has declined to do so.

imum, based upon time served for two prior state drug convictions. The Court also recommended that the Bureau of Prisons credit Williams with an additional 13 months for time served on a prior juvenile offense, and with approximately 28-29 months for time in federal custody.

Williams raises only one issue on appeal. The District Court, he contends, should have credited the 13-month term because 18 U.S.C. § 3584, as applied here, violates his Fifth Amendment due process right. That provision states, in relevant part: "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively." 18 U.S.C. § 3584(a). Williams argues that the statute draws an arbitrary distinction between discharged and undischarged sentences. The Government counters that Williams did not raise this issue contemporaneously, and that a reversible plain error did not occur. Williams offers no reply, and there is no evidence suggesting preservation. Our review, then, is for plain error.

We need not address the merits of Williams's constitutional challenge to § 3584. For even if there was an error, it was not plain. A "court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *Olano*, 507 U.S. at 734. Every court of appeals to have considered the issue, or a related challenge to U.S.S.G. § 5G1.3(b), has rejected Williams's argument. *See United States v. Lucas*, 745 F.3d 626, 630-31 (2d Cir. 2014) (per curiam); *United States v. Dunham*, 295 F.3d 605, 610-11 (6th Cir. 2002); *United States v. Otto*, 176 F.3d 416, 418 (8th Cir. 1999). Only a district court, in another circuit, has held to the contrary. *United States v. Hill*, 187 F. Supp. 3d 959, 965 (N.D. Ill. 2016). Given the balance of such authority, it cannot be said the assumed error here is "'obvious' or 'clear under current law.'"

*Vazquez*, 271 F.3d at 100 (quoting *Olano*, 507 U.S. at 734). We reserve for another day our own views on the merits.

## 2. Hernandez

At Hernandez's sentencing hearing, his attorney, Morris, stated that "Mr. Hernandez does not desire to address the court this morning. However, he did want me to say that he wanted to thank his family for their support of him throughout this process, and so we'd have nothing further beyond that." App. 289. The District Court accepted this submission, and, after allowing the Government an opportunity to speak, announced its judgment. It did not address Hernandez personally, and neither Morris nor the Government raised Hernandez's right to allocution. *See* Fed. R. Crim. P. 32(i)(4)(a)(ii); *Green v. United States*, 365 U.S. 301, 305 (1961) (plurality opinion); *id.* at 307 (Black, J., dissenting).

Hernandez now argues that he is entitled to resentencing proceedings under *United States v. Adams*, 252 F.3d 276 (3d Cir. 2001). The Government concedes the point, but it asserts without elaboration that resentencing "should be limited to providing Hernandez the opportunity to allocute should he so desire." Gov't Br. at 212. We disagree. In *Hill v. United States*, 368 U.S. 424 (1962), the Supreme Court cited *Van Hook v. United States*, 365 U.S. 609 (1961) (per curiam), for the appropriate remedy in direct appeals. 368 U.S. at 429 n.6. *Van Hook* is a one-sentence opinion, stating: "The judgment is reversed and the case remanded for resentencing in compliance with" Rule 32 and *Green*. 365 U.S. at 609. This language provides no indication of a limited remand, and our post-*Adams* cases have not applied such a remedy. *See United States v. Chapman*, 915 F.3d 139, 147 (3d Cir. 2019); *United States v. Paladino*, 769 F.3d 197, 204 (3d Cir. 2014); *United States v. Plotts*, 359

F.3d 247, 251 (3d Cir. 2004). Hernandez is entitled to a resentencing proceeding, with all its attendant considerations.[42] *See, e.g.*, *Pepper v. United States*, 562 U.S. 476 (2011). However, the District Court may, in its discretion, allow the Government to offer new evidence. *United States v. Dickler*, 64 F.3d 818, 831-32 (3d Cir. 1995).

### 3. Kelly

Kelly brings several challenges to his concurrent life sentences. Five of those challenges are unique to him. He asserts four procedural defects in the District Court's decision, and he claims that the sentences were substantively unreasonable. We review procedural-soundness and substantive-unreasonableness challenges for abuse of discretion. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). Further, "[w]e exercise plenary review of a district court's interpretation of the Sentencing Guidelines and review its factual findings for clear error." *United States v. Welshans*, 892 F.3d 566, 573 (3d Cir. 2018). Four of the issues are meritless. The other leaves Kelly's sentence unaffected.

1. *Dangerous-weapon enhancement.* Kelly asserts that the District Court erred in applying the two-level enhancement for possession of "a dangerous weapon" in connection with a controlled-substances offense. U.S.S.G. § 2D1.1(b)(1). We disagree. The government can show possession simply "by establishing that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014) (internal quotation marks omitted). If it does so, the burden

---

[42] Because we reach this conclusion, we address neither Hernandez's other sentencing challenges nor the effect of the mandatory minimum error at Count II.

shifts to the defendant to show that "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11. Here, Cordaress Rogers testified that Kelly supplied drugs to numerous younger dealers and helped to introduce guns to the South Side, that a lot of people had guns, and that guns were stashed on the blocks. The prevalence of firearms was also described in other testimony. This evidence establishes the requisite nexus, and Kelly gives no indication of clear improbability.

2. *Organizer or leader increase.* Kelly contends that the District Court erred in applying a four-level increase for being "an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). When determining whether to apply this enhancement, a court should consider, among other things, "the nature of participation in the commission of the offense, . . . the degree of participation in planning or organizing the offense, [and] the nature and scope of the illegal activity." U.S.S.G. § 3B1.1 cmt. n.4. As just noted, the evidence indicated that Kelly supplied a substantial amount of crack to the younger generation of street-level dealers, associated with other key suppliers such as Cruz and Hernandez, and helped to introduce guns into the South Side-Parkway rivalry. In this light, we cannot say the District Court clearly erred in imposing the enhancement.

3. *Calculation of criminal-history score.* Kelly next contests his classification as a career offender for purposes of his criminal-history category. Under the Guidelines, a defendant is a career offender if he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). An offense committed before the age of 18 may qualify "if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted." U.S.S.G. § 4B1.2 cmt. n.1. Kelly argues that one of his

predicate convictions, a November 1994 conviction in New York state court for attempted murder, was not so classified. The District Court found that it was, based largely on a "Sentence & Commitment" form of the New York Supreme Court, Bronx County.

This finding was not clearly erroneous. As the District Court pointed out, on the form there were two options after the line "The defendant having been." Gov't Supp. App. 165. One was "convicted of the crime(s) of"; the other, "adjudicated a Youthful Offender." The former was checked, suggesting Kelly's conviction was the same as that for an adult. At the bottom of the form was written "YO denied." The District Court reasonably inferred that this meant "youthful offender denied." Kelly App. 518. Finally, simply because Kelly was marked a "Juvenile Offender" on the form is not, under applicable New York law, indicative of a non-adult conviction. *See In re Raymond G.*, 715 N.E.2d 486, 488 (N.Y. 1999); *Matter of Vega*, 393 N.E.2d 450, 452-53 (N.Y. 1979).

4. *Use-of-violence enhancement.* Kelly points out that the District Court failed to consider his objection to the two-level enhancement under U.S.S.G. § 2D1.1(b)(2). The Government essentially concedes the point, arguing only that the District Court addressed Kelly's use of violence when it rendered its decision. But, of course, the sentencing judge must make "an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Nevertheless, because we reject Kelly's other procedural challenges, this error does not affect his total offense level.

5. *Substantive reasonableness.* "[I]f the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district

86

court provided." *Tomko*, 562 F.3d at 568. In rendering its judgment, the District Court said: "[Kelly's] not here for an isolated event, he's here for a decade-long conspiracy that involved multiple episodes of violence and harm to innocen[ts] in the community . . . . The defendant was at the core of this enterprise and these violent acts." Kelly App. 528. The District Court noted Kelly's "involve[ment] in drug and gang activity from a very young age." Kelly App. 528. It observed that "[h]e was a leader of the gang . . . and was a participant and present at many of the violent activities that occurred here." Kelly App. 528. A reasonable jurist easily could have imposed the life sentences the District Court did.

### 4. Schueg

Schueg's challenges to his concurrent 165-month sentences all relate to the assessment of fines and costs. After stating simply that Schueg "has the ability to pay a fine," the District Court ordered that he, together with other defendants, pay $6,500 in restitution under the Mandatory Victims Restitution Act (MVRA). Schueg App. 63-64. It also ordered payment of the special assessment under 18 U.S.C. § 3013(a)(2)(A), and of certain costs of prosecution, including $13,948.76 for the compensation of York police officers who testified at trial. Although Schueg challenges the MVRA and police compensation orders on substantive grounds, he also, as a threshold matter, contests the District Court's finding of an ability to pay. The PSR found that Schueg lacked such an ability, and he raised the issue in his sentencing memorandum.

Under the MVRA, a district court must "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid," after considering the defendant's "financial resources and other assets," projected income, and "financial obligations." 18 U.S.C. § 3664(f)(2).

87

We have interpreted this provision loosely, requiring only that "the record evidence[] a court's consideration of the defendant's financial situation," though "express findings" need not be made. *United States v. Lessner*, 498 F.3d 185, 202 (3d Cir. 2007). Nevertheless, in this case, we cannot find in the record any consideration of Schueg's financial condition. There was testimony regarding a denial of financial aid on a college application, and gifts that Schueg gave to his sister's children. None of that, however, goes to his ability to pay at the time of sentencing. While the District Court did specify a payment schedule, there is no indication where the Court determined Schueg had the ability to fulfill that schedule—especially given the PSR's finding and Schueg's objection in his sentencing memorandum. We will, therefore, vacate the District Court's judgment of sentence as it relates to the assessment of restitution, fines, and costs, and remand for consideration of Schueg's ability to pay.

### 5. Atkinson

Atkinson contests the District Court's application of a two-level enhancement for obstructing the administration of justice. To be eligible for that increase, a defendant must (as relevant here) have "willfully . . . attempted to obstruct or impede[] the administration of justice with respect to the . . . sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. While Atkinson was in prison awaiting sentencing, he allegedly stabbed Carl Hodge, a fellow prisoner, multiple times while the latter was in the shower. The proximate cause of the episode, according to Hodge's testimony at Cruz's sentencing hearing, was that Hodge came into possession of a cellphone Hernandez was using for ongoing illegal activities: bribing prison guards, selling drugs, and arranging a murder. Hodge began to share the phone's contents with the Government. Cruz and Atkinson became suspicious, leading to the assault.

Atkinson does not dispute Hodge's testimony. He argues, rather, that even if he had a motive to harm Hodge because of suspected cooperation, he could not reasonably have believed that Hodge would testify against him at sentencing. *See United States v. Galaviz*, 687 F.3d 1042, 1043 (8th Cir. 2012). Section 3C1.1 does not demand such a standard. Testimony at sentencing is only one means Hodge could potentially have disadvantaged Atkinson's legal position. As the facts show, Hodge was cooperating with regard to contemporaneous events, disclosing potentially prejudicial material to the Government. To demand that Atkinson reasonably believed Hodge would testify against him is unduly limiting and beyond the text of § 3C1.1. "[T]he administration of justice with respect to" sentencing encompasses more than witness testimony.

From that perspective, Atkinson's enhancement must remain. His "instant offense" was among other things RICO conspiracy, and Hodge was suspected of (and indeed was) revealing to the Government information related to ongoing concerted illicit activities of at least Hernandez, Cruz, and Atkinson. That goes directly to the offense of which Atkinson was convicted and awaiting sentencing. The District Court, then, did not clearly err in finding a nexus between the attack and Atkinson's pending legal proceedings.

### B. Collective Challenges

### 1. Drug Quantity

Rice, Eatmon, and Kelly challenge the District Court's drug-quantity attributions pursuant to the Guidelines' relevant-conduct provision.[43] *See* U.S.S.G. §§ 1B1.3(a)(1)(B),

---

[43] Villega also seeks to challenge his offense level on this ground, pointing out that the District Court did not rule on his

2D1.1(a). Our review is for clear error. *United States v. Perez*, 280 F.3d 318, 352 (3d Cir. 2002). "[W]e permit some degree of estimation in drug conspiracy cases because the government usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy." *United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020) (internal quotation marks omitted). Nevertheless, information used for sentencing "must have 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Miele*, 989 F.2d 659, 663 (3d Cir. 1993) (quoting U.S.S.G. § 6A1.3(a)).

Rice's PSR recommended a base offense level of 30, due to a drug-quantity attribution of 280-840 grams of crack. *See* U.S.S.G. § 2D1.1(c)(5). The District Court adopted this recommendation based upon the findings of the jury. Although the jury's findings were on a conspiracy-wide basis, the District Court could also, by a preponderance of the evidence, have incorporated those findings consistent with the relevant-conduct standard. *See Collado*, 975 F.2d at 995.

---

objections regarding drug quantity, a dangerous-weapon enhancement, and relevant conduct for the RICO conspiracy. But there is good reason for that: Villega's trial counsel and the Government agreed, and represented to the District Court at the sentencing hearing, that the baseline would be an offense level of 37, which, with a criminal history category of VI, resulted in a Guidelines range of 360 months to life imprisonment. Villega's counsel thereafter raised no objections to the calculation, and the District Court applied no additional enhancements. The ultimate sentence was below the agreed-upon range. Contrary to Villega's representations on appeal, it is clear that he waived any challenges to his offense level. *See, e.g.*, *United States v. Ward*, 131 F.3d 335, 342-43 (3d Cir. 1997).

As remarked above, Rogers testified that in the conspiracy's early years, he, Atkinson, Eatmon, and Rice all sold crack they received from Hernandez and Kelly. Rogers agreed that they were "essentially getting the same quantities or similar quantities," App. 3544-45, and he estimated that in this time he received approximately 1 kilogram of crack from both Hernandez and Kelly. Further, in around 2006-2007, when those suppliers were imprisoned, Rogers said that he, Atkinson, Eatmon, Sistrunk, and Rice continued to sell drugs together, and that they mutually facilitated each other's drug dealing. Rice does not dispute this testimony, and other evidence indicates his continued involvement in the conspiracy in the years thereafter. The District Court did not clearly err in its attribution.

The same goes for Eatmon. He received a base offense level of 38, on an attribution of 28 kilograms or more of crack. Rogers testified that for about a year between 2006 and 2007, he would bring back from New York 500 to 1000 grams of crack "[e]very couple of days." App. 3573. He agreed that he distributed, and that he saw Eatmon and others distribute, "many kilos of crack" over that time. App. 3575. Further, Darvin Allen testified that around that same time, for approximately one to two years, he received from Eatmon about 14 grams of crack a week. Eatmon indicates nothing in the record to doubt the reliability of this testimony. The attribution of 28 kilograms or more was not clear error.

Finally, Kelly's challenge fails on a similar basis. His base offense level, like Eatmon's, was 38, thanks to an attribution of 28 kilograms or more of crack. Rogers testified that he received approximately 1 kilogram of crack from each of Hernandez, Cruz, and Kelly in the years after 2002, and, as just noted, he said that Atkinson, Eatmon, and Rice all received a similar amount from at least Hernandez and Kelly. There was also testimony from a high-level South Side supplier, who said

91

that in these years he moved 500 grams to 1 kilogram of crack a week, including deliveries to Cruz and Hernandez. Further, Rogers testified that by 2012, Kelly was present when he paid Hernandez for crack that had been fronted. This indicates Kelly's continued active participation in the conspiracy. Finally, as mentioned above, there was evidence that Kelly continued to associate with Cruz and Hernandez, and supply crack even up to the time of the initial indictment in March 2014. Given this longitudinal evidence of Kelly's twelve-year participation in the highest levels of the conspiracy, the indications of persistent drug-dealing activity, and the testimony regarding the amounts involved, we cannot say the District Court clearly erred in its attribution.

## 2. Body-Armor Enhancement

During his testimony regarding the early years of the conspiracy, Rogers said that he saw Hernandez and Kelly wearing bulletproof vests on multiple occasions at Maple and Duke Streets. Under the Guidelines, a defendant "convicted of a drug trafficking crime or a crime of violence" may be eligible for a two- or a four-level increase to his offense level based on the use of body armor in the commission of the offense. U.S.S.G. § 3B1.5(1). The two-level increase applies when "the offense involved the use of body armor." U.S.S.G. § 3B1.5(2)(A). The four-level one applies if "the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense." U.S.S.G. § 3B1.5(2)(B). Kelly received the latter enhancement; Atkinson and Eatmon the former.

Kelly asserts that Rogers's testimony does not provide a sufficient nexus between the wearing of the body armor and the commission of the offense. The commentary to § 3B1.5 de-

fines "use" in part as "active employment in a manner to protect the person from gunfire." U.S.S.G. § 3B1.5 cmt. n.1. Kelly was said to have worn body armor multiple times on Maple and Duke Streets—the eponymous location of the primary crew of drug traffickers on the South Side. Further, Rogers's testimony was not an offhand remark; it came in the context of a description of the conspiracy's early years, when Kelly and Hernandez began supplying crack to Rogers, Atkinson, Eatmon, and Rice. Kelly, Hernandez, and Cruz would be "standing there on Duke Street, so you would just buy the drugs from them and then go sell them on your own." App. 3546. It was also when Kelly and Hernandez helped to introduce guns to the South Side, and the South Side-Parkway rivalry escalated from fistfights to gunfights. There is, therefore, a spatial and temporal nexus between Kelly's use of the body armor and the commission of the conspiracy offense. Application of the four-level enhancement was not clear error.

This same evidence supports the application § 3B1.5(2)(A) to Atkinson and Eatmon. We apply to the Guidelines the ordinary principles of statutory interpretation. *See, e.g.*, *United States v. James*, 952 F.3d 429, 433, 439 (3d Cir. 2020). The provisions here are notably different: while the four-level enhancement concerns the actions of the *defendant*, the two-level one concerns the nature of the *offense*. The latter—which encompasses "the offense of conviction and all relevant conduct," U.S.S.G. § 3B1.5 cmt. n.1 (citing U.S.S.G. § 1B1.1 cmt. n.1(I))—need only "involve[]" the use of body armor. According to Rogers's testimony, Kelly and Hernandez's use of the body armor occurred at the time Atkinson and Eatmon were being supplied by them. Eatmon protests he had not joined the conspiracy by this point, but he presents no evidence to question the District Court's judgment.

### 3. Costs of Prosecution

Seven Defendants—Cruz, Hernandez, Villega, Kelly, Schueg, Atkinson, Sistrunk, and Eatmon—challenge the District Court's assessment of a fine to reimburse the City of York for the overtime wages paid to York police officers who testified at trial. The Government concedes the issue. We will, therefore, vacate this aspect of the challengers' judgments of sentence.

## VII.   CONCLUSION

For the foregoing reasons, we will affirm the Defendants' judgments of conviction, and the judgments of sentence of Williams and Rice. We will vacate Hernandez's judgment of sentence in full, and Schueg's judgment of sentence as to the assessment of restitution, fines, and costs. We will remand those two cases for resentencing proceedings consistent with this opinion. We will also vacate the judgments of sentence of Cruz, Villega, Kelly, Atkinson, Sistrunk, and Eatmon as to the police overtime costs.

RESTREPO, *Circuit Judge*, dissenting.

The District Court issued a *sua sponte* order closing the courtroom for jury selection. Appellants were eventually convicted on various counts related to their involvement in a local street gang and were sentenced to prison. Among other issues they raise on appeal, Appellants argue that they are entitled to a new trial because of the courtroom closure. Due to the deep roots the right to a public trial has in our history and its critical importance to the functioning of our criminal justice system, I would reverse Appellants' convictions and remand for a new trial. I respectfully dissent.

## I.

Following an extensive investigation conducted by the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, a grand jury returned a six-count indictment against twenty-one defendants. From 2002 to 2014, the defendants were alleged to have participated in a racketeering conspiracy, a drug trafficking conspiracy, and drug trafficking while involved with a York, Pennsylvania street gang. After nine defendants entered into plea agreements with the Government, twelve went to trial. Ten of these defendants (collectively, "Appellants") now appeal their convictions and sentences ranging from sixty months to life imprisonment.

On the eve of the trial, the District Court issued an order closing the courtroom for the entirety of jury selection. In full, the order states:

> **AND NOW**, on this 18th day of September 2015, **IT IS HEREBY ORDERED THAT** due to courtroom capacity limitations, only (1) court

1

personnel, (2) defendants, (3) trial counsel and support staff, and (4) prospective jurors shall be allowed into the courtroom during jury selection. No other individuals will be present except by express authorization of the Court.

App. 10 (bold in original).  Neither the Government nor the defendants requested this order, and the District Court did not seek their input.  The Court closed the courtroom to the public without determining whether it was necessary or considering any alternatives.  None of the defendants objected to the order, and *voir dire* then took place for two days.

## II.

We must now decide whether to correct an erroneous courtroom closure despite Appellants' failure to object.  As a preliminary matter, it is imperative to understand the contours of the constitutional right in question.

The Sixth Amendment provides that "the accused shall enjoy the right to a speedy and public trial"—and the Supreme Court has long recognized the importance of the public trial right for the accused and the broader community.  *See, e.g., In re Oliver*, 333 U.S. 257 (1948).  "[T]he Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam); *see also Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984) (noting that "the accused's right [to a fair trial] is difficult to separate from the right of everyone in the community to attend the *voir dire*" under the First Amendment).  As a part of the public trial right, criminal defendants and the public at large are entitled to open proceedings.

2

The public trial guarantee is deeply rooted in our common law heritage. In England, early court proceedings required public access to "moots," which later evolved into juries, consisting of "the freemen of the community." *See Press-Enterprise*, 464 U.S. at 505. In the eleventh century, the jury began to transform into a small group of individuals that represented the community, but "the public character of the proceedings, including jury selection, remained unchanged." *Id.* at 506. As early as the sixteenth century, jurors in England were selected "openlie in the presence of the Judges, the Justices, the enquest, the prisoner, *and so many as will or can come so neare as to heare it*." *Id.* at 507 (emphasis in original) (quoting Thomas Smith, *De Republica Anglorum* 96 (1565) (Alston ed. 1906)).

The presumption of public jury selection "carried over into proceedings in colonial America." *Id.* at 508 (discussing accounts on the need for bystanders at trials following the Boston Massacre). Many of the thirteen colonies enacted statutes requiring jury selection to occur in open court. *See id.* ("Public jury selection . . . was the common practice in America when the Constitution was adopted."). For instance, a 1773 statute in North Carolina required that court clerks,

> write the Names of all Petit Jurors appearing, on Scrolls or Pieces of Paper, which shall be put into a Box; and on every Issue in every Suit where it is not otherwise agreed by Consent, a Child under Ten Years old, *in open Court*, shall draw out of the said Box Twelve of the said Scrolls or Pieces of Paper.

James Davis, *Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force & Use* 549

3

(1773) (emphasis added). Delaware employed a similar system in which prospective jurors' names were placed in a box until "some indifferent person, by the direction of the court, may and shall, *in open court*, draw out twelve of the said pieces of parchment or paper." 2 *Laws of the State of Delaware* 1073 (Samuel & John Adams eds. 1797) (emphasis added). These are just two examples, as open *voir dire* proceedings were the practice at the time of our Nation's founding.

The Sixth Amendment enshrined the presumption of public access in the Constitution. The Founding Fathers believed that public court proceedings provided safeguards integral to the nascent republic. At the Constitutional Convention, broad agreement existed regarding the jury trial's importance as "a valuable safeguard to liberty . . . [or] the very palladium of free government." *The Federalist* No. 83, at 461 (Alexander Hamilton) (P.F. Collier ed., 1901). And jury selection was viewed as a "double security" against corruption that would require a person to "corrupt both the court and the jury." *Id.* at 463.

Enunciating "revolution principles" under the pseudonym "Novanglus," John Adams struck similar themes when he explained that "draw[ing] [jurors] by chance out of a box *in open town meeting*" best "secured against a possibility of corruption of any kind . . . having seen with their own eyes, that nothing unfair ever did or could take place." John Adams, *Novanglus; or, A History of the Dispute with America from Its Origin, in 1754, to the Present Time*, The Revolutionary Writings of John Adams 152, 199 (C. Bradley Thompson, ed., 2000) (emphasis added). These sentiments were explicitly incorporated into the Constitution in the language of the Sixth Amendment.

4

It is thus no surprise that the Supreme Court classifies courtroom closures "as a structural error" that generally "entitl[es] the defendant to automatic reversal."[1] *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905 (2017) (plurality opinion). Courts usually reverse criminal convictions tainted by a structural error because they affect "the framework within which the trial proceeds," thus "infect[ing] the entire trial process" and undermining the ultimate determination of "guilt or innocence." *Neder v. United States*, 527 U.S. 1, 8–9 (1999) (citations and internal quotation marks omitted). An open courtroom during jury selection is fundamental to protecting defendants' right to a jury free from prejudice and ensuring

---

[1] There are limited instances in which closing a courtroom is not structural error. A judge may order a closure based on findings that specifically identify "higher values" that must be preserved. *Waller v. Georgia*, 467 U.S. 39, 45 (1984) (quoting *Press-Enterprise*, 464 U.S. at 510); *see also Weaver*, 137 S. Ct. at 1909 ("[A] judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so."). Trial courts are required to "consider alternatives to closure even when they are not offered by the parties." *Presley*, 558 U.S. at 214.

The District Court did not consider alternative options or make any factual findings in support of its order. The Government points to comments the District Court made on the number of people in the courtroom. However, these comments do not support the proposition that the District Court made the required findings because they came days after the order and are not linked in any discernible way to the closure.

public confidence in the administration of justice. *See Press-Enterprise*, 464 U.S. at 508; *United States v. Negrón-Sostre*, 790 F.3d 295, 301 (1st Cir. 2015). Accordingly, it was a structural error to close the courtroom during *voir dire*.

## III.

There are instances in which a structural error does not automatically lead to a reversal. In *Weaver*, the Supreme Court recently examined an erroneous courtroom closure on collateral review. Due to space limitations, "an officer of the court excluded from the courtroom any member of the public who was not a potential juror." *Weaver*, 137 S. Ct. at 1906. Citing finality concerns, the plurality concluded that the petitioner did not demonstrate prejudice as required for a new trial under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Weaver*, 137 S. Ct. at 1912–14. Although the *Weaver* plurality cautioned courts not to assume that public trial violations always require reversal in a collateral proceeding, it did not address the appropriate remedy when the error is raised for the first time on direct review.

Here, Appellants did not object to the District Court's closure order or otherwise preserve their claim during the trial. We thus review the order for plain error. Fed. R. Crim. P. 52(b). Appellants must satisfy four prongs under plain error review. *See United States v. Olano*, 507 U.S. 725, 736 (1993). They must show (1) that there was an error, (2) that was "clear or obvious," and (3) it must have impacted their "substantial rights." *Puckett v. United States*, 556 U.S. 129, 135 (2009). The third prong generally "means that the error must have been prejudicial," meaning "[i]t must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

6

Fourth, reviewing courts have discretion to remedy a forfeited error if it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (citation and internal quotation marks omitted). Only the third and fourth prongs are relevant for our purposes because the parties agree that the closure was a clear error. Below, I will consider these prongs in turn.

## A.

*Olano*'s substantial rights prong typically requires a showing of prejudice. *Puckett*, 556 U.S. 129. "To satisfy this . . . condition, the defendant ordinarily must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018) (citation and internal quotation marks omitted). But "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome." *Olano*, 507 U.S. at 735. The Majority declines to address whether an erroneous courtroom closure fits this "special category" under the third *Olano* prong. Majority Op. at 17 (noting that it need not decide because it declines to exercise discretion under the fourth prong). I disagree and would hold that the specific structural error at issue here fits the special category of errors that must be corrected even without a particularized showing of prejudice and thus satisfies *Olano*'s third prong.

The Supreme Court has made clear that structural errors generally result in the reversal of a conviction because they "are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome." *Neder*, 527 U.S. at 7. Requiring defendants

7

to make a specific showing of prejudice when claiming a structural error on direct review would force them to engage in a "speculative inquiry into what might have occurred in an alternate universe." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–50 (2006) (describing why it is "unnecessary to conduct an ineffectiveness or prejudice inquiry" to establish a violation to the "right to counsel of choice").

The District Court's closure of the courtroom during *voir dire* is the prototypical constitutional error that is impossible to measure. "Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . , or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989). Public jury selection proceedings impact the way in which potential jurors respond to questions about their past experiences and the types of questions attorneys ask them. *See Negrón-Sostre*, 790 F.3d at 305–06.

The difficulty in determining the level of prejudice is precisely why structural errors are presumed to affect defendants' substantial rights. *See Neder*, 527 U.S. at 7. Contrary to the Majority, I do not view the conclusion that the District Court's courtroom closure affected Appellants' substantial rights as a "doctrinal leap." *See* Majority Op. at 17. It would be illogical to classify an error as structural because it affects substantial rights but then conclude that it did not affect defendants' substantial rights for purposes of *Olano*'s third prong. Given the difficulty of measuring prejudice arising from a public trial violation and the importance of jury selection in protecting criminal defendants, this Court should presume prejudice and hold that Appellants have satisfied the substantial rights prong.

**B.**

The District Court's order also undermines the fairness, integrity, and public reputation of the trial proceedings, thus satisfying *Olano*'s fourth prong. As explained above, open *voir dire* is key to ensure that unprejudiced jurors are ultimately selected to serve on juries. It also serves as a check on judicial abuse against defendants caught up in the criminal justice system. *See United States v. Lnu*, 575 F.3d 298, 305 (3d Cir. 2009) (stating that the public trial right "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution") (citation and internal quotation marks omitted). Even in cases where there are no further constitutional violations, open jury selection maintains the public's confidence in the system by enhancing "the appearance of fairness."[2] *Press-Enterprise*, 464 U.S. at 508; *see also Waller*, 467 U.S. at 46 (stating that public trials ensure that the "judge and prosecutor carry out their duties responsibly" and "discourages perjury").[3]

---

[2] These fairness concerns are particularly relevant in light of the District Court's handling of the *Batson* challenge in chambers. Although I agree with the Majority that the resolution of the challenge *in camera* was harmless, the District Court's conduct is concerning because it represents another instance in which the Court limited access to jury selection proceedings.

[3] Concerns related to public confidence in the proceedings are especially relevant here given the local media coverage into the case. *See, e.g.*, Keith Schweigert, *York member of Southside gang to serve 21 years on drug, racketeering charges*, Fox 43 (December 21, 2018, 11:24

The pivotal role that public proceedings play in our judicial system is precisely why reviewing courts find it particularly problematic when trial judges themselves limit access to courtrooms. *See Weaver*, 137 S. Ct. at 1913 (emphasizing that the "closure decision . . . was made by court officers rather than the judge"). It is also why trial judges are responsible for considering alternatives to closure even if none are raised by the parties. *Presley*, 558 U.S. at 214–15 (noting that trial courts must consider alternatives given jury selection's importance "to the adversaries [and] to the criminal justice system") (citation and internal quotation marks omitted). As the reviewing court, it is imperative that we correct the District Court's structural error because it undermines the integrity and public reputation of criminal proceedings that resulted in Appellants' convictions.

Instead, the Majority conducts a cost-benefit analysis to justify leaving the public trial violation uncorrected. Majority Op. at 29 (declining remedial action because "the remedy is to be assessed relative to the costs of the error"). This approach is foreign and detrimental to our structural error jurisprudence.

The Majority first minimizes the impact of the error by pointing out that there is no evidence anyone sought to access to the courtroom, that there is no indication of wrongdoing by the District Court or the Government, and that transcripts of

AM), https://fox43.com/2018/12/21/york-member-of-southside-gang-to-serve-21-years-on-drug-racketeering-charges/; Christopher Dornblaser, *Life in prison for York City Southside gang leader,* York Dispatch (October 3, 2017, 8:03 PM), https://www.yorkdispatch.com/story/news/2017/10/03/life-prison-york-city-southside-gang-leader/729170001/.

*voir dire* were made available. Majority Op. at 26–28. The availability of transcripts does little to mitigate the error because "no transcript can recapture the atmosphere of the *voir dire*, which may persist throughout the trial." *Gomez*, 490 U.S. at 874–75; *see also United States v. Antar*, 38 F.3d 1348, 1360 n.13 (3d Cir. 1994) (explaining that "the translation of a live proceeding to a cold transcript" misses "some information, concerning demeanor, non-verbal responses, and the like").

The other two factors the Majority mentions miss the point of structural errors like public trial violations. Much of the Majority's analysis relies on cases that consider errors reviewed for harmlessness. *See* Majority Op. at 23–25. At one point, the Majority even posits that "apart from cases of actual innocence, an altered outcome does not in itself necessitate correction of the error." Majority Op. at 25. The Majority overlooks the critical fact that we do not review criminal trials with a structural error for harmlessness because such trials "cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (citation and internal quotation marks omitted). Because public trial violations corrupt the very mechanism used to determine guilt or innocence, we cannot measure the true costs of leaving the District Court's error uncorrected.

The Majority next focuses on the high costs of remedial action to correct the error. Correcting the public trial violation would require reversal of Appellants' convictions, which resulted from two-month long proceedings completed five years ago, and remand for a new trial. The costs to remedy the District Court's error are indeed considerable. I disagree, however, with the central role the Majority affords these costs

11

in its plain error analysis. The District Court committed a grave constitutional violation by simultaneously violating twelve defendants' right to a public trial for the entirety of jury selection. The nature of the error, not the cost of correcting it, must be the lodestar of our consideration of a structural error on plain-error review. The District Court "undermine[d] the structural integrity of the criminal tribunal itself" in a way that "is not amenable to harmless-error review"—and the Majority allows this to stand. *Vasquez v. Hillery*, 474 U.S. 254, 263–64 (1986). It is perverse to weigh the costs of judicial efficiency against Appellants' constitutional rights when the District Court undeniably committed structural error.

For the reasons stated above, I respectfully dissent. A balancing test or a cost-benefit analysis is an improper and unjust method for determining whether to protect certain fundamental constitutional rights. The public trial right is one of these fundamental rights. It has deep roots in our Nation's history and is essential to the functioning of our criminal justice system. I would therefore reverse Appellants' convictions and remand for a new trial.